[Crim. No. 6154.   Second Dist., Div. One.   Oct. 16, 1958.]

THE PEOPLE, Respondent, v. JOSEPH LOUIS RUMPH
et al., Appellants.

Crispus A. Wright for Appellants.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendants were charged with the crime of robbery, (Pen. Code, § 211), in that they did by means of force and fear take $63 in money from the person of James Long.

Defendants pleaded not guilty, trial by jury was duly waived, and the cause was submitted to the trial court on the transcript of the preliminary examination, each side reserving the right to offer evidence in addition to that contained in the aforesaid transcript. Following a reading of the transcript and presentation of additional testimony, the court adjudged defendants guilty as charged. Motion for a new trial was denied as to each defendant, and they were committed to the Youth Authority of the State of California. From the judgment of conviction and the order denying their motions for a new trial both defendants prosecute this appeal.

Concerning the factual background surrounding this prosecution, the record reflects testimony that on the evening of May 11, 1957, at approximately 10:15 p. m., James Long, proprietor of a service station in the city of Los Angeles, was seated alone in the office of his service station. He had been on duty since 7:30 a. m. that morning but was not "overly tired" or sleepy since it was his usual routine to work these long hours. During this period Long had not used stimulants. Some 15 minutes earlier, at about 10 p. m., Long had checked the cash register in the service station office and found that it contained approximately $63, representing part of his business proceeds for that day.

At approximately 10:15 p. m., on the aforesaid night, defendants Rumph and Shamburger appeared at the door of the service station. The area both inside and outside the service station office was well lighted. Long walked to the door and was directly facing the defendants, when Rumph jumped to one side and pushed something hard into Long's side, the latter not actually seeing a gun at this time. Defendant Rumph informed Long that it was a holdup and when Long asked him what he said, defendant Shamburger then exhibited a gun and told Long that this was a "stickup."

Long was pushed over to the cash register, was told to open it, and defendant Rumph then removed the money. After the money had been taken, defendants Rumph and Shamburger ran from the service station and fled on foot, their departure being witnessed by Joseph White, a customer, who arrived just before defendants ran out the door. As the defendants ran out the door, White had a direct view of their faces at a distance of approximately 18 feet for a period of about five seconds.

On June 17, 1957, at approximately 1:14 a.m., Sergeant Gaylord L. Campbell of the South Pasadena Police was

stationed in his police car on the Orange Grove Bridge above the `Pasadena Freeway. He observed a car, which in his estimation was exceeding the 55-mile-per-hour speed limit on the Pasadena Freeway, proceed along the freeway, up the ramp to the Orange Grove Bridge and skid through the stop sign at the top of the ramp. As the vehicle negotiated a right-hand turn after skidding through the stop sign, Sergeant Campbell turned on his red light and gave chase, honking his horn at the same time. The automobile turned right at the first block south of the freeway and finally stopped after Sergeant Campbell had pulled alongside in his police car. Two of the three occupants of the car were defendants Rumph and Shamburger, and when the driver Rumph was questioned about his manner of driving, he stated that ''someone was chasing them.'' Because of the apparently excessive speed of the car, the fact that it skidded through a stop sign and turned down a residential side street after he gave chase, the lateness of the hour, the apparently unsubstantiated excuse that ''someone was chasing'' the car, and the fact that defendants were Negroes and the residential street down which they turned was part of an all-Caucasian neighborhood, Sergeant Campbell believed that the occupants of the car might have committed a felony. Because of this belief, he arrested the occupants and subsequently searched the car in which they had been riding, the result of the search being the discovery of a loaded .38 caliber revolver in the glove compartment of the car.

On approximately June 20, 1957, James Long appeared at the Los Angeles Police Department building and there viewed a police lineup of possible suspects consisting of about 20 men, approximately 15 of whom were Negroes. The defendants Rumph and Shamburger were among those appearing in the lineup, but were separated by five or six men. At this lineup Long was able to positively identify defendants Rumph and Shamburger as the men who robbed him on the night of May 11, 1957.

Some time after the viewing of the lineup and the identification of the defendants by Long, Joseph White also appeared at the Los Angeles Police Department building and there looked over pictures of possible suspects and viewed a police lineup. He was shown a group of pictures and shortly thereafter viewed a police lineup of approximately 10 men, consisting of both Negro and Caucasion suspects including

defendants Rumph and Shamburger, they being separated by approximately two men in the lineup. At this time White identified, both from the pictures and from the lineup, the defendants Rumph and Shamburger as the men he had seen running from Long's service station on the night and at the time of the robbery.

Both defendants were sworn as witnesses in their own behalf. Defendant Shamburger testified that he was not in Los Angeles at any time during the evening of May 11, 1957. That about 10:30 p.m. on that date (when the robbery occurred), he was at home where he arrived about 10 p.m. that night. That when he arrived at his home, his mother, father, brothers, sisters and a friend, Mr. Noulin Hollingsworth were there. Ollie Mae Butler testified that she lives in Pasadena. That she saw defendant Shamburger, on May 11, 1957, the date of the robbery, at the B & C Restaurant about a quarter to 8. She further testified that she and Shamburger along with a Mr. Percy Moore, left the B & C Restaurant about 10 minutes after 8, and that they walked to Fair Oaks and Colorado where they stood under a canopy while it was raining, and that they walked to Green Street and Shamburger left them at that time; that she came back to her home with Percy Moore; that defendant Shamburger came to her home about a quarter of 9 and that Roosevelt Butler "picked Shamburger up" from her house.

Roosevelt Butler testified that he took defendant Shamburger in his automobile from the latter's home between 5:30 and 6 p.m. on the evening here in question; that they rode around until about 7:30 p.m. when they let defendant out of the automobile at the home of the witness Ollie Mae Butler. That about 9:45 p.m. he "picked up" defendant Shamburger, drove him to the latter's home, and saw him go through the door into the house. The witness Percy Moore corroborated in general, the testimony of Ollie Mae Butler.

Defendant Shamburger's father testified that the former arrived home on May 11, 1957 at about 10 p.m. and did not leave the house at any time during the night.

Testifying in behalf of defendant Rumph, his father stated that the gun found in the car driven by the defendant belonged to his wife and although usually kept locked up in a small box at home was, on the day of defendant Rumph's arrest, missing, the back of the box having been pried off. Defendant Rumph testified that he had broken into his father's locked box and obtained the gun found in the car

at the time of his arrest, June 17, 1957, because his life had been threatened on the 16th of June, 1957. Defendant Rumph further stated that one Gordon Holt had threatened to shoot him in connection with some girl, although Rumph had met Holt only two or three times and had not gone with any girl that Holt was interested in. He denied any participation in the robbery of which he was accused.

Appellants' sole contention is that the decision of the court was contrary to law and the evidence in that the latter was legally insufficient to sustain the finding of guilt. Appellants urge that since they were not arrested until more than a month after the alleged robbery, their identification would be rendered difficult. That since the victim had been working from 7:30 a.m. on the date of the crime which occurred around 10 p.m., he was tired and, according to the witness White, appeared to be nervous, that "It is quite obvious that the human body cannot take such an assault (the robbery) without the mind being affected so far as the ability to identify is concerned." However, the victim testified that he was not overly tired or sleepy because it was his usual custom to work these long hours.

Appellants direct our attention to certain testimony given by the prosecution witnesses indicating some uncertainty as to the type and color of the clothing worn by the robbers, whether they wore hats or caps, or had mustaches or sideburns. All these contentions present factual situations for determination by the duly constituted arbiter of the facts. ██ It has long been the rule, strictly adhered to in this state, that in the exercise of their appellate jurisdiction, the courts of appeal are restricted to the consideration of questions of law alone, and that, therefore, the matter of evidence does not constitute a subject of review by those tribunals, except where there necessarily arises from the evidence or is presented thereby, from its very nature, a question of law, such as where the evidence bears upon its face the brand of improbability, or which may be said to be unbelievable, *per se,* because it involves a claim that something has been done that it would not seem possible could be done under the circumstances described in the evidence. In such a situation, the issue becomes one of law. The instant case does not present such an issue. ██ While the claimed weakness in the identification testimony of two of the prosecution's witnesses undoubtedly afforded opportunity for a persuasive argument to the trial judge against the reliability of such testimony, we

see in them nothing from which a reviewing court could justly conclude that their entire testimony is, *per se*, unbelievable, and that it was, therefore, the duty of the trial judge not only to disregard it, but to accept appellants' testimony and that of their alibi witnesses, and therefrom conclude that the appellants' guilt had not been disclosed by the evidence to a moral certainty and beyond a reasonable doubt. The record reveals that the victim and the witness Joseph White positively identified appellants as the perpetrators of the robbery. Also, as heretofore set forth in the factual narrative of this prosecution, both of the aforesaid witnesses, prior to the trial, positively identified appellants when the witness recognized them in a police "lineup," and Mr. White recognized them in pictures shown him of possible suspects. ▮ On appeal, we are not authorized to retry the case or reweigh the evidence. Our function is limited to a determination of whether there is sufficient evidence in the record, contradicted or uncontradicted, to justify the conclusion that a crime was committed and that the accused were the perpetrators thereof. ▮ Questions of the weight of evidence, and the credibility of witnesses being for the trial court, it necessarily follows that when the circumstances shown, reasonably justify the finding of guilt, an opposing view that such circumstances may be reconciled with innocence will not warrant interference with the judgment on appeal. ▮ As was said in *People* v. *Smith*, 35 Cal.App.2d 73, 76 [94 P.2d 633] : ". . . it is a matter for the trial judge to be persuaded beyond a reasonable doubt and not this court."

▮ What we have herein stated is equally applicable to appellants' contention that the "alibi" testimony of their witnesses was sufficient to "raise a reasonable doubt whether defendant was present when the crime was committed." The trial judge had the witnesses before him. He was afforded an opportunity to observe their demeanor, candor or lack of candor; as well as the fact that they were all relatives or close friends of appellants and their consequent interest in the outcome of the prosecution. It is manifest that he questioned their veracity to the extent that, in the light of other evidence positively identifying appellants as having committed the crime charged against them, the "alibi" evidence did not create in his mind a reasonable doubt as to the guilt of the accused. Considered in the light of the rule announced in *People* v. *Newland*, 15 Cal.2d 678, 681, 682 [104 P.2d 778], a declaration by this court that the adjudication of guilt by

the trial judge in the case now engaging our attention is barren of a sufficient foundation to uphold it, would not be justified.

For the foregoing reasons, the judgment and the order denying defendants' motion for a new trial are, and each is affirmed.

Fourt, J., and Lillie, J., concurred.

The petition of Joseph Louis Rumph for a hearing by the Supreme Court was denied December 10, 1958.