[Crim. No. 4350.   First Dist., Div. One.   Feb. 20, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. SANTIAGO T. MELENDEZ, Defendant and Appellant.

Benjamin M. Davis and George Franklyn Duke for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Michael R. Marron, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—This is an appeal by defendant from a judgment of conviction for violation of Health and Safety Code section 11530, i.e., possession of marijuana. The sole

question presented is whether the evidence is sufficient to prove defendant guilty of possessing marijuana. The case was tried without a jury, and, aside from the testimony of a forensic chemist produced by the People, was, pursuant to stipulation, submitted to the court below upon the testimony presented at the preliminary hearing in the municipal court.

The evidentiary background is as follows: On September 8, 1962, Police Officer Charles Anderson, in company with another officer,[1] responded to a call reporting an altercation in the hallway of the Hudson Hotel in San Francisco. Upon arrival, the officers observed defendant and a woman in a hallway of the hotel. The woman stated to the officers that she was afraid of defendant because he was "going to shoot her with some white powder, and put her to sleep." Anderson examined the woman's arms and observed "[n]umerous apparent needle punctures in them," near or about the crook of the arm. The woman denied using narcotics. During this conversation defendant and the woman were in the hallway outside defendant's hotel room,[2] the door to which was slightly ajar. The woman requested Anderson to accompany her so that she could get her purse, and he thereupon followed her into the room. There was no one else in the room. Anderson observed, on a night stand and in full view, a syringe, a hypodermic needle, and several vials or ampules which were labeled "methedrine." At this point, defendant, who had remained in the hallway, was requested to come into the room. Confronted with the syringe and the ampules found on the night stand defendant admitted that they were his. He produced another container bearing his name and containing more ampules. When asked to verify his name, defendant produced a driver's license. He also produced from his wallet a prescription label bearing a different name. At that time he also showed the officers prescriptions for some of the methedrine ampules. The officers thereupon proceeded to make a search of the room. Anderson's partner found a brass pipe which he called to Anderson's attention. Anderson testified that he saw the pipe in his partner's hand; that it was found in his "immediate presence...." After stating that he "believed" that the pipe was in the drawer of the dresser, to which answer defendant's counsel interposed a motion to strike, Anderson testified as follows:

---

[1]The record does not disclose the name of this officer.

[2]At oral argument defendant's counsel conceded that this was defendant's room.

"My partner was investigating the dresser, and I know he opened the drawer, but whether he took the pipe from the top of the dresser, or out of the drawer he opened I couldn't say."[3] This pipe was described as consisting of two pieces of brass connected by a piece of bamboo "in the shape of a right angle cigarette holder . . . ."

Other than hereinabove narrated, Anderson could recall no other conversation with defendant. He stated that he did not believe that there had been any conversation relative to the subject contraband, or the evidence in question. The pipe was delivered to the crime laboratory. John F. Williams, a forensic chemist, whose qualifications as an expert were stipulated to, testified that when he received the pipe it "had an odor of burnt material which was similar to burnt marijuana"; and that there was a small amount of black material in the brass and wooden portions of the pipe which was extracted and chemically tested; that what he saw was a black substance "like the heel of an ordinary pipe"; that it was a gummy material with some ash, similar to "anything else that is burned"; that had the material been scraped out and weighed "[i]t would have been a matter of a few milligrams or a very small fraction of a gram at most"; that for the purposes of the chemical tests some of the material was scraped from the brass portion which constituted the bowl, and some was soaked from the side of the bamboo or stem; that the black material was examined under a low power microscope and that no plant structure was noted; that there were no actual plant parts in the pipe; that the chemical tests disclosed the residue of "active ingredients from marijuana"; that the tests proved that marijuana had been in the pipe at some time or other and that now some of the "active ingredients remained"; and that these ingredients consisted of "certain compounds which are present in marijuana."[4]

---

[3]The committing magistrate then overruled the objection. No objection to this testimony was interposed in the court below.

[4]Pertinent is the following testimony elicited from Williams by the trial court: "THE COURT: Is it your testimony that marijuana had been in the pipe or that marijuana was in the pipe or both? THE WITNESS: Well, the marijuana, in some form, had been volatilized and condensed out in the pipes which would infer, I think, that the material had been smoked in the pipe and some of the residue was left. THE COURT: Well, did the residue consist of marijuana? THE WITNESS: It consisted of some of the active ingredients of marijuana, but a similar test on a tobacco pipe, for instance, that hasn't some marijuana,

■ The foregoing evidentiary narrative must be considered in the light of the well-established principle that in a prosecution for unlawful possession of narcotics the People must prove that the accused exercised dominion and control over the drug with knowledge of its presence and narcotic character. (*People* v. *Redrick,* 55 Cal.2d 282, 285 [10 Cal. Rptr. 823, 359 P.2d 255]; *People* v. *Gorg,* 45 Cal.2d 776, 780 [291 P.2d 469]; *People* v. *Gory,* 28 Cal.2d 450, 454 [170 P.2d 433]; *People* v. *Tabizon,* 166 Cal.App.2d 271, 273 [332 P.2d 697]; *People* v. *Rodriguez,* 151 Cal.App.2d 598, 601 [312 P.2d 272].) ■ Accordingly, the crime of possession of narcotics requires a physical or constructive possession with actual knowledge of the presence of the narcotic substance and knowledge of the narcotic character of the article possessed. (*People* v. *Winston,* 46 Cal.2d 151, 160-161 [293 P.2d 40]; *People* v. *Gory, supra,* at p. 456.)

■ Although the parties to this appeal have argued to some extent the question whether defendant had exclusive access to the room in question, and whether, if such access was nonexclusive, there were other evidentiary factors present sufficient to support a finding of knowing possession on the part of defendant, the principal question on this appeal is whether the possession of the subject smoking pipe, from which a gummy black material extracted therefrom was determined by chemical tests to contain certain active ingredients found in marijuana, constitutes the knowing possession of the narcotic itself. Stated more succinctly, the question for determination is whether the People's evidence was sufficient

would not show the chemical tests for the cannabis sativa, which is in the marijuana and that was present in the pipe.''

''THE COURT: What is not clear to me is, now, the statute says or condemns possession of marijuana. Now, was there in this pipe marijuana or a residue of marijuana? THE WITNESS: Well, once marijuana is burned it burns itself out usually as ordinary tobacco does, plus a brown gummy resin which—''

''THE COURT: Is there any further light to be thrown on that. I don't know that you can. THE WITNESS: No. I think that is going to resolve itself as a technicality which I suppose the Court will have to decide whether the material which has been reduced to an ash and the condensate from the gaseous material is still the original material.''

''THE COURT: Somewhere along the line marijuana stops and these components start. THE WITNESS: That is right, completely. Just like coal, when you burn it, you get coal tar which contains a number of the constituents of coal, yet they are condensed out and used as specific chemicals, in this case, some of the active ingredients remained identifiable, at the bottom, and leaves an ash, then you would have nothing. It is a fine point to know where the line should be drawn.''

as a matter of law to convict defendant of "possession" of marijuana, because of the nature and state of the substance claimed by the prosecution to be a narcotic.

This very same question was presented to the reviewing court in *People* v. *Aguilar*, 223 Cal.App.2d 119 [35 Cal.Rptr. 516], recently decided.[5] The appellate court there held that where a narcotic is imperceptible to the human eye, and its presence, qualitatively and quantitatively, can be detected only with the aid of a forensic chemist and laboratory, the evidence is not sufficient to sustain a conviction of knowing possession of the narcotic. The rationale of *Aguilar* is that: "It is not scientific measurement and detection which is the ultimate test of the known possession of a narcotic, but rather the awareness of the defendant of the presence of the narcotic. Guilt or innocence on a charge of illegal possession may not be determined solely by the skill of the forensic chemist in isolating a trace of the prohibited narcotic in articles possessed by the defendant. (Pp. 122-123.) Accordingly, the essence of the holding in *Aguilar* is that "[t]he presence of the narcotic must be reflected *in such form* as reasonably imputes knowledge to the defendant." (P. 123; italics added.)

In *Aguilar*, a motel room occupied by the defendant and his brother was searched by officers who found packages containing hypodermic needles, spoons and eye droppers. A forensic chemist testified that he examined " 'debris' " (scrapings) found on each of the two spoons, and that in his opinion the debris contained heroin. (P. 120.) Upon discovery of these packages the defendant stated " 'There is nothing in there but an outfit.' " (P. 120.) In a conversation with one of the officers the defendant stated that he was " 'hot' " (meaning addicted to narcotics) ; that he had done well for a year on the Naline program, but that he had met a fellow who " 'turned him on again' "; that he had been using narcotics for more than one month " 'real heavy' "; and that he was " 'running' from his parole officer . . ." (P. 120.) The reviewing court there inferred from the evidence that heroin in powder form had been liquefied and the resultant emulsion drawn from the spoons by means of hypodermic needles and used for injection purposes. "What remained in the bottom of the spoons," said the court, "was residue which was in a completely different form from that of heroin

---

[5]A hearing was denied by the Supreme Court on January 29, 1964.

powder." (P. 122.) The court went on to note that "The crystalline incrustations on the spoons could remain in that state indefinitely, long after actual use of the spoons for injection purposes. ... Any nonscientifically trained person, albeit an addict, observing the spoons, likewise would have been unable to detect the presence of heroin since neither powder nor liquid remained." (P. 122.)

The appellate court in *Aguilar* discussed several California cases wherein it was held that the presence of a narcotic in a minute amount or in fragmentary form is sufficient to sustain a finding of knowing possession of the narcotic (see *People* v. *Anderson,* 199 Cal.App.2d 510, 520 [18 Cal.Rptr. 793]; *People* v. *Marich,* 201 Cal.App.2d 462, 463-465 [19 Cal.Rptr. 909]; *People* v. *Salas,* 17 Cal.App.2d 75, 78 [61 P.2d 771]; *People* v. *Jones,* 113 Cal.App.2d 567, 570 [248 P.2d 771]; *People* v. *One 1959 Plymouth Sedan,* 186 Cal.App.2d 871, 874 [9 Cal.Rptr. 104]), and distinguished these cases on the basis that the small quantity of narcotics there found was in a recognizable state, while under the facts of the case before it the substance was in a completely different form, unrecognizable as a narcotic except by the scientific measurement, detection and skill of a forensic chemist.

Comparing the facts in *Aguilar* with those in the case at bench we find a marked similarity. Here, the evidence is that marijuana was at some time smoked in the subject pipe, and that what remained in it was a gummy black material in a completely different form than that of the vegetable matter recognizable as marijuana. Like the crystalline incrustations on the spoons in *Aguilar,* the gummy material attached to the pipe in the instant case could have remained there indefinitely in that state, long after the marijuana had been smoked. It is apparent, moreover, from Williams' testimony that a nonscientifically trained person could not detect the presence of marijuana even by observing the black material in the bowl of the pipe. It is significant to note, moreover, that *Aguilar* is a much stronger case from the prosecution standpoint than the present case in that there the chemist was able to detect a minuscule amount of heroin. In the case at bench, the chemist was not able to detect any marijuana plant structure or material, but only certain active ingredients consisting of "certain compounds which are present in marijuana." Moreover, it is clear from Williams' testimony that he himself doubted that the substance which he chemically tested was then identifiable as marijuana. If one scien-

tifically trained and aided by the techniques of forensic science finds difficulty in identifying a substance, certainly it cannot be reasonably expected that a nonscientifically trained person can make such identification. While not of paramount significance in the determination of the question presented in this case, it is noteworthy that, unlike the factual situation in *Aguilar*, defendant did not admit that he was a narcotic user or that he was in possession of narcotics paraphernalia; nor did he make any other admissions. Defendant was not interrogated concerning the pipe nor was any conversation had with respect to it. He was not shown to be a user of narcotics or to have any connection with them.

We conclude, therefore, that even if it be assumed that the substance in question was in fact a narcotic, under the circumstances of this case it cannot be said that its presence was reflected in such a form as reasonably imputed knowledge to defendant that it was marijuana. Accordingly, a finding that defendant ''possessed'' marijuana is not warranted within the requirement of knowing possession, and the evidence is not sufficient to sustain a conviction of knowing possession of the narcotic.

The judgment is reversed.

Bray, P. J., and Sullivan, J., concurred.