[Crim. No. 4441. First Dist., Div. One. June 23, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CLARENCE
WILSON, JR., et al., Defendants and Appellants

Clarence Wilson, Jr., and Otis Amis, in pro. per., Donald C. Knutson and Lin B. Densmore, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Edward P. O'Brien and James Murad, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.— This is an appeal by defendants, Clarence Wilson, Jr. and Otis Amis, from judgments of conviction in

Alameda County for committing the crime of transporting, selling, furnishing and giving away heroin.[1] (Violation of Health & Saf. Code, § 11501.) Count I of the information charged Wilson and Amis jointly with a violation of Health and Safety Code section 11501 on September 10, 1962, and Count II charged Wilson with a separate violation of the same code section on September 3, 1962.[2] The jury returned guilty verdicts against defendants on each count of the information.

## The Record

The facts established by the record, most favorable to the People's case, are as follows:

On September 3, 1962, about 5:15 p.m., Agent Sergio Borquez and Charles Alexander, described as a "special employee" of the Federal Bureau of Narcotics, drove in a government vehicle to Wilson's home at 599-58th Street in Oakland. Two other agents, Yates and Van Raam, followed Borquez and Alexander in another automobile to this same address. Upon arrival at Wilson's house, Borquez and Alexander emerged from the car, and Alexander walked over to a window and knocked on it. Shortly thereafter Wilson appeared at the front door. Alexander introduced Borquez to Wilson and they talked for several minutes. Alexander informed Wilson that they "had 40" and would like to obtain "some stuff," to which Wilson replied that they would have to go with him. The three men then drove off in Wilson's car. Yates and Van Raam, who had observed the meeting between Alexander, Borquez and Wilson, but had been unable to hear the conversation, followed the three men to a nearby gas station. While at the gas station, Wilson left the car, stating that he had to make a telephone call and would return shortly. Upon returning to the car Wilson drove Alexander and Borquez to 18th Street, just off Market, and parked alongside the

---

[1]Defendants have also appealed from the order denying their motion for a new trial. Such order is not appealable where an appeal is taken from a final judgment of conviction. However, upon appeal from a final judgment, the court may review an order denying a motion for a new trial. (Pen. Code, § 1237; *People* v. *Jones*, 228 Cal.App.2d 74, 79 [39 Cal.Rptr. 302].)

[2]Count II of the information also charged Wilson with three prior felony convictions, namely: (1) Possession of narcotics in Los Angeles in 1951, for which he served a term in San Quentin; (2) possession of narcotics in Alameda County in 1954, for which he received probation; and (3) petty theft with a prior felony conviction in Contra Costa County in 1959, for which he served a term in San Quentin. Amis was also charged with a prior felony conviction of a sale of narcotics in Santa Clara County in 1957, for which he served a term in San Quentin.

curb. Wilson alighted from the car, turned the corner and was lost from Borquez' view. About half an hour later, at 6:10 p.m., Wilson reappeared, entered the car, and drove off, returning to the same location approximately 20 minutes later. Wilson then told Borquez and Alexander to leave the car, whereupon Wilson drove off by himself. About 15 minutes later, he rejoined Alexander and Borquez and drove them back to his home, arriving there at about 7 p.m. The three men left the car and entered the house. In the kitchen Wilson handed Alexander three bindles wrapped in a piece of paper. Alexander then gave these bindles to Borquez, at the same time giving Wilson $40 which Borquez had previously given to him. Borquez pocketed the three bindles, departed from the house with Alexander and returned to San Francisco in his own automobile. The three bindles contained 1.5 grams of heroin.

On September 10, 1962, at about 5 p.m., Borquez, known to Wilson as Johnnie, telephoned Wilson at his home and informed Wilson that he wished to see him. Wilson replied that Borquez should come in about an hour to "the same place as before." Accordingly, about 6 o'clock that evening Borquez arrived at the 599 - 58th Street address and knocked on the window of Wilson's house, but receiving no response, he drove off. Shortly thereafter Yates and Van Raam parked near Wilson's home and observed Wilson and Amis drive up in a car and park at the rear of 599 - 58th Street. At approximately 6:30 p.m. Borquez returned to Wilson's house, parked his car in a Safeway Store parking lot at the corner of 57th and Shattuck and approached the car in which defendants were seated. Borquez conversed with Wilson, was introduced by him to Amis, and the three talked for several minutes. Borquez and Amis then parted company with Wilson and entered Borquez' car. After conversing briefly, Amis told Borquez that he had to make a telephone call, stepped out of the car, and walked away from the parking lot, turning a corner, out of Borquez' vision. Returning sometime later Amis entered the car and directed Borquez to drive. At about 7:20 p.m. Amis instructed Borquez to stop at 8th and Campbell, stating that he was going to make a telephone call. Again Amis walked around a corner and was lost from Borquez' sight. He returned about five minutes later and directed Borquez to start driving. At 54th and Grove Street Amis again directed Borquez to pull over to the curb and once again he left the car and walked around the corner. Before Amis departed, Borquez explained to him that he only wanted "$20 worth of the stuff" and that he did not want to pay any more because he didn't want to "get

burned." Amis assured him, however, that he would not "get burned."

When Amis returned to the automobile, he directed Borquez to drive around the block and then to stop at approximately the same location where they had previously parked. Amis located a certain parking meter and requested Borquez to stop adjacent to it, telling Borquez that he would find a package at the base of the parking meter. Borquez found a small package about 1½ inches in circumference at the base of the parking meter and brought it to Amis. Amis opened the bundle and removed from it a smaller package which he gave to Borquez. Borquez explained that he would not pay until he had an opportunity to "test the stuff." They then drove to a barbecue restaurant where Borquez went to the men's room and immersed a small amount of the contents of one of the packages in a Marquis reagent, obtaining a positive reaction. Borquez returned to the car and the two drove back to 54th and Grove where Borquez paid Amis $20. At that time Borquez observed Wilson standing in a nearby doorway. The quantity of heroin sold in this instance amounted to .020 grams.

### Amis' Appeal

On this appeal court appointed counsel for Amis makes the following contentions: (1) That the trial court erred in denying Amis' motion for a continuance to obtain the testimony of Alexander; (2) that the amount of heroin allegedly sold was insufficient to constitute a violation of Health & Safety Code section 11501; and (3) that the evidence was insufficient to sustain the conviction. With respect to contention (2) it is also urged that the trial court erred in excluding testimony of the impracticability of making any real use of the quantity of heroin involved, and that it erred in instructing the jury that the possession of heroin in any amount constitutes a violation of the law. In addition, Amis, acting in propria persona, makes certain claims of error as follows: (1) That the trial court erred in failing to discharge the jury upon learning of the possible intoxication of a juror and of her communication with prosecution witnesses; (2) that the trial court lacked jurisdiction to hear the case because the evidence was obtained by federal agents; and (3) that it was error to introduce evidence of Amis' prior conviction.

(a) *The Motion for a Continuance*

The record discloses that the jury was impaneled on Febru-

ary 21, 1963, and that the trial was then continued to February 26, 1963, on which day, during the cross-examination of Borquez, counsel for Amis inquired as to Alexander's given name, ascertaining that it was Charles. Counsel then requested Borquez to inspect the records of the Bureau of Narcotics in an effort of locate Alexander. The court sustained an objection to this line of questioning, determining that if counsel so desired, he could subpoena the records of the bureau. On February 27, counsel for Amis requested that the court allow expenses for an investigator or, in the alternative, that it direct the district attorney's office to employ its investigative staff to locate Alexander. The court denied this request. Thereafter, and on the same day, the People rested; opening statements were made by counsel for both defendants; and Wilson took the stand as a witness, testifying both on direct and cross-examination. Upon adjournment on February 27, the trial was continued to March 1. When the trial resumed on this date, counsel for defendants requested a reasonable continuance to obtain the presence of Alexander as a witness.[3] The trial court indicated its concern at this late request for a continuance in view of defense counsel's reputation for diligence and the fact that counsel had been appointed on January 9, 1963. In connection with their request defendants called as a witness John Vance, a private investigator. Vance testified that he was hired on February 27 to locate Alexander; that on the following day he located and spoke with Alexander, who was living under another name at the Leopold Hotel in San Francisco; that the next morning, March 1, he attempted to serve a subpoena on Alexander,[4] but Alexander did not respond to his knock on the door and he was unable to locate Alexander. Based on this testimony, defense counsel made a formal motion for a continuance, which motion was denied without prejudice. The court indicated, however, that since several hours would intervene prior to argument of counsel it would permit Alexander to testify if he were produced prior to that time. However, upon the conclusion of the testimony on the afternoon of March 1, counsel for Amis advised the court that defendants would not be able to produce Alexander. Defendants then renewed their motion for a continuance and the same was denied.

The granting of a request made by a defendant for a

---

[3]Counsel for Amis was the spokesman for the defense on this motion.
[4]This subpoena for Alexander was not issued until February 28, 1963, after Vance had located and talked with Alexander.

continuance of his trial rests within the discretion of the trial court. (*People* v. *Ketchel*, 59 Cal.2d 503, 546 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Murphy*, 59 Cal.2d 818, 825 [31 Cal.Rptr. 306, 382 P.2d 346]; *People* v. *Buckowski*, 37 Cal.2d 629, 631 [233 P.2d 912].) ▪ Absent an abuse of discretion and a showing of prejudice, the denial of a continuance cannnot compel a reversal of a judgment of conviction. (*People* v. *Justice*, 211 Cal.App.2d 660, 665 [27 Cal. Rptr. 465]; *People* v. *Markos*, 146 Cal.App.2d 82, 86 [303 P.2d 363].) Section 1050 of the Penal Code states in relevant part: "No continuance of a criminal trial shall be granted except upon affirmative proof in open court, upon reasonable notice, that the ends of justice require a continuance." As we remarked in *Justice*: "Where a continuance is refused, therefore, the question presented is whether the trial court abused its discretion in determining that there was no affirmative showing that the ends of justice required a continuance. [Citation.] Each case must be determined by its own particular facts. [Citation.]" (P. 665.)

▪ In order to invoke the discretion of the trial court to grant a continuance to obtain the presence of a witness, the moving party has the burden of showing that the following legal criteria have been satisfied: (1) That the movant has exercised due diligence in an attempt to secure the attendance of the witness at the trial by legal means; (2) that the expected testimony is material; (3) that it is not merely cumulative; (4) that it can be obtained within a reasonable time; and (5) that the facts to which the witness will testify cannot otherwise be proven (*People* v. *Collins*, 195 Cal. 325, 333 [233 P. 97]; *People* v. *Carter*, 208 Cal.App.2d 722, 724 [25 Cal.Rptr. 527]; *People* v. *Dalton*, 201 Cal.App.2d 396, 407 [20 Cal.Rptr. 51, 95 A.L.R.2d 628]; *People* v. *Peters*, 191 Cal.App.2d 581, 586 [12 Cal.Rptr. 745]; *People* v. *Carroll*, 160 Cal.App.2d 6, 9-10 [324 P.2d 713].)

▪ In the light of these principles we now analyze the showing which defendants made in the present case in support of their request for a continuance. This showing was made by means of an offer of proof consisting of the testimony of Vance, who stated that Alexander had told him that sometime before Christmas Alexander was en route to Wilson's house to purchase narcotics when he met a man whom he knew as Johnnie, who was also "looking for a buy"; that the two men then started toward Wilson's home in Oakland, but before they reached his home, they encountered him sitting in his

car along MacArthur Boulevard; that the three men drove to 18th and Market Streets in Wilson's automobile, whereupon Wilson left his companions, walked up to another parked car, conversed with the occupants and returned to his own car; that he then gave Alexander a bindle of heroin and more than one bindle to Johnnie, in exchange for which he received money from both men; and that Alexander proceeded to Wilson's home where he injected himself with the narcotics, but Johnnie did not do so because he had purchased the narcotics for "his woman." Vance also testified that Alexander told him that he had never seen nor had any dealings with Amis.

The foregoing testimony, which was clearly not in the form of conclusions, meets the requirement that the expected testimony must be described. (*People* v. *Hanz*, 190 Cal.App.2d 793, 798 [12 Cal.Rptr. 282] ; *People* v. *Ah Fat*, 48 Cal. 61, 63.) Insofar as its probative value is concerned, the described testimony has materiality since it tends to contradict Borquez' statement that Alexander was the only person who gave money to Wilson and supplies the added evidence that Alexander injected himself with the heroin while at Wilson's home. This latter fact was also material to the defense which Wilson raised by his testimony at the trial, namely, that Alexander visited him with Johnnie and pleaded that Wilson purchase some narcotics as Alexander needed them. The reqirement that the proffered testimony must not be cumulative, i.e., the same facts cannot be elicited from some other person who is available, or from some source other than testimony, is also satisfied. In the instant case there is no other independent evidence pertaining to the facts set out in the offer of proof other than the testimony expected to be elicited from Alexander who was the only person other than Borquez and Wilson present at the transaction which occurred on September 3, 1962. It is apparent, therefore, that Alexander's testimony would tend to impeach and contradict Borquez' testimony with respect to the alleged transaction with Wilson. Insofar as Amis is concerned, however, the described testimony has little, if any, probative value since Alexander told Vance that he did not know Amis and since Borquez did not testify as to any activities of Alexander in connection with Borquez' dealings with Amis. The only connection between Amis and Alexander is that the latter introduced Borquez to Wilson who in turn introduced Borquez to Amis. The described testimony, however, has some materiality as regards Amis since its impeachment effect on Borquez' testimony regarding the

Wilson transaction would tend to affect Borquez' credibility as to his entire testimony in the case.

Turning to the showing as to whether Alexander could have been produced within a reasonable time, we are satisfied that this requirement was met. The fact that Vance had previously contacted Alexander at the latter's hotel, coupled with Vance's statement that he would be forced to "stake out" the front of the hotel in order to serve him, warrants the inference that Alexander could have been produced within a reasonable time.

The showing on the issue of whether defendants exercised due diligence in attempting to obtain the attendance of Alexander is, however, such that the court was well within its discretion in refusing defendants' application for a continuance. The existence of Alexander and his role in the case did not appear for the first time during Borquez' examination. Nor is there a showing that defendants did not know of Alexander's role in the case prior to Borquez' testimony. On the contrary, the cross-examination of Borquez by Amis' counsel indicates that the latter knew of the existence of Alexander prior to this time. The record discloses that Borquez had made reference to Alexander in his testimony at the preliminary hearing and that defense counsel had a copy of the transcript of this hearing at the trial. Although a copy of such transcript is not a part of the record on this appeal, and although the record is silent as to when and to whom such transcript was delivered, we are entitled, in the absence of a showing to the contrary, to presume that official duty was regularly performed (Code Civ. Proc., § 1963, subd. 15), and that such transcript was delivered to defendants at least five days prior to trial as provided in Penal Code section 869. Additionally, we have the testimony of Wilson that he and Alexander were acquaintances for approximately 15 years. Moreover, Wilson knew of Alexander's role in the dealings had with Borquez. It was apparent, therefore, that Alexander's participation was known to defendants prior to trial. In addition, there is an absence of evidence that defendants made any effort to locate Alexander prior to trial in order to obtain his version of the transaction which occurred on September 3, 1962. It is likewise apparent that the determination to call Alexander as a witness was not made until Borquez testified, at which time it appeared to counsel that Alexander might be used to impeach Borquez. Alexander's story could well have been obtained prior to trial and he could

then have been placed under subpoena so as to have made him available at the trial. Accordingly, in the context of these facts, we cannot say that the trial court abused its discretion in refusing to grant the requested continuance.

#### (b) *The Quantity of Heroin*

By an elaborate process of mathematical computations counsel for Amis concludes that his client was convicted of selling heroin in a quantity less than 1/17th of an aspirin tablet in size.[5] He claims that it was error for the court to exclude testimony concerning the impracticability of making any real use of such a minute quantity of heroin. He also contends that it was error for the court to instruct the jury that the possession of heroin in any amount constituted a violation of the law.[6]

Health and Safety Code section 11501 provides in pertinent part as follows: ''Except as otherwise provided in this division, every person who transports, imports into this State, sells, furnishes, administers or gives away, or offers to transport, import into this State, sell, furnish, administer, or give away, or attempts to import into this State or transport any narcotic . . . shall be punished by imprisonment in the state prison. . . .'' It is apparent from the use of the term ''any narcotic'' in this statute, that the Legislature has not required a certain quantity of narcotic as a prerequisite to a conviction under this section. A research of the decisional law has revealed no case defining the meaning of ''any narcotic'' as set forth in section 11501. A number of California cases have, however, discussed the meaning and effect of similar language in section 11500 dealing with the possession of narcotics. (See *People* v. *Anderson,* 199 Cal.App.2d 510, 519-521 [18 Cal.Rptr. 793] ; *People* v. *Marich,* 201 Cal.App.2d 462, 464 [19 Cal.Rptr. 909] ; *People* v. *Thomas,* 210 Cal.App. 2d 553, 557 [26 Cal.Rptr. 843] ; *People* v. *Collins,* 212 Cal. App.2d 151, 154 [27 Cal.Rptr. 825] ; see also *People* v. *Salas,* 17 Cal.App.2d 75, 78 [61 P.2d 771] ; *People* v. *Jones,* 113 Cal. App.2d 567, 569-570 [248 P.2d 771] ; *People* v. *One 1959*

---

[5]The forensic chemist testified that the substance in the bindle weighed .020 grams. In addition to finding heroin, he found procaine, lactose, starch, alkaloids and chlorides. However, he made no quantitative test for heroin.

[6]The instruction in pertinent part stated that: ''The law does not fix any minimum amount of heroin that is necessary to constitute the possession or sale thereof. The possession of heroin in any amount constitutes a violation of the law.''

*Plymouth Sedan,* 186 Cal.App.2d 871, 874 [9 Cal.Rptr. 104].)
In *Anderson,* where there was about 5/1000ths of a gram, this
same argument was made, that is, that the " 'substance . . .
[was] so small as to be beyond any practical use. . . .' " (P.
520.) The reviewing court, in holding that the requirements
of the statute were met, stated that "The cases hold that the
statute does not require the possession of any specific quan-
tity of narcotics." (P. 520.) In *Marich,* the appellate court
reached the same conclusion in spite of the fact that prac-
tically all of the visible powdery fragments which had been
found had been utilized in the course of the chemical analyses
used to determine that the powdery residue contained heroin.
In *Thomas,* the appellate court stated that "Any quantity
that is susceptible of being identified comes within the pro-
scription of the law." (P. 557.) Upon analogy, therefore,
we see no reason why the meaning applied to the words "any
narcotic" in possession cases should not be applied to such
language in the statute having to do with the sale of narcotics.

 Amis cites *People* v. *Cole,* 113 Cal.App.2d 253 [248
P.2d 141] ; *People* v. *Hyden,* 118 Cal.App.2d 744 [258 P.2d
1018] ; and *Anderson* as supportive of his contention that a
conviction for a sale or possession of an infinitesimal quantity
of narcotics cannot be upheld unless the prosecution shows
other incriminating circumstances, such as an admission, re-
cent use of narcotics or furtive conduct. The *Anderson, Hyden*
and *Cole* cases do not stand for the rule espoused by Amis.
As already pointed out *Anderson* holds that the possession of
any specific quantity of narcotics is not required in order to
sustain a conviction for possession of narcotics. It was noted
in *Anderson,* however, that there were other elements in the
case that the jury "could consider while giving significance to
the small quantity involved." (P. 520.) *Hyden* merely holds
that it was error to dismiss a prosecution on the ground that
2 milligrams of morphine could not sustain a conviction as
a matter of law. It was there held that since there was evi-
dence in the case such as narcotics paraphernalia and the
defendant's admission that he was using narcotics, it was for
the trier of fact to determine whether the evidence was suffi-
cient to sustain a conviction. *Cole* is distinguishable since it
dealt with the evidence of the *knowing* possession of a nar-
cotic. As noted in *Anderson, Cole* does not hold that as a
matter of law there cannot be possession of " 'insignificant
fragments' " (p. 520), but holds that an erroneous instruc-

tion to the effect that the evidence need not show that defendant knew the objects he possessed were narcotics was prejudicial when such is the state of the evidence concerning the narcotics.

Analogizing the instant case with those which have considered the question of knowing possession in narcotics cases, we find that it is well established that the presence of a narcotic in a minute amount or in fragmentary form is sufficient to sustain a finding of knowing possession of the narcotic. (*People* v. *Melendez,* 225 Cal.App.2d 67, 72 [37 Cal.Rptr. 126]; *People* v. *Aguilar,* 223 Cal.App.2d 119, 121-122 [35 Cal.Rptr. 516]; *People* v. *Anderson, supra,* p. 520; *People* v. *Marich, supra,* p. 464; *People* v. *Salas, supra,* p. 78; *People* v. *Jones, supra,* pp. 569-570; *People* v. *One 1959 Plymouth Sedan, supra,* p. 874.) With respect to knowing possession, it is only where the small quantity of the narcotic is in a completely different form, unrecognizable as a narcotic except by the scientific measurement, detection and skill of a forensic chemist, that the evidence is insufficient to sustain a conviction of knowing possession of the narcotic in the absence of other incriminating circumstances such as admissions, previous use of narcotics, or furtive conduct. (*People* v. *Melendez, supra,* pp. 72-73; *People* v. *Aguilar, supra,* p. 123.) In the present case the substance sold by Amis was in its powder form, and although the quantity was infinitesimal, it had not been transmuted into a substance that bore no identifiable characteristics with the original material.

What we have hereinabove said likewise applies to the claim that the proffered testimony would have had the tendency to impeach Borquez on the basis that it was incredible that a federal agent would spend $20 for such a small amount of heroin. The circumstance of the agent's payment of $20 for .020 grams of heroin was a proper subject of inquiry upon cross-examination. Such an inquiry was not dependent upon the foundation testimony that it was impracticable to make any real use of the heroin herein involved. Suffice it to say, since the amount of narcotics involved was sufficient to sustain a conviction, and since Borquez' duties entailed the apprehension of narcotic offenders, it is not unreasonable to infer that he would expend such an amount of money in the attainment of that objective. In sum, we conclude that under the circumstances here present the trial court did not err in excluding the proffered testimony and in instructing the jury as it did.

(c) *The Sufficiency of the Evidence*

Amis' contention that the evidence is insufficient to sustain the conviction is predicated upon the argument that the testimony of Borquez was of doubtful validity. By alluding to the preliminary transcript he seeks to point out inconsistencies in Borquez' testimony.

As a general rule, matters of evidence do not constitute a subject of review by courts of appeal "except where there necessarily arises from the evidence or is presented thereby, from its very nature, a question of law, such as where the evidence bears upon its face the brand of improbability, or which may be said to be unbelievable, *per se,* because it involves a claim that something has been done that it would not seem possible could be done under the circumstances described in the evidence." (*People* v. *Rumph,* 164 Cal.App.2d 262, 267 [330 P.2d 694].) Accordingly, all that an appellate court can do is to ascertain from the record if there is any substantial evidence to support the verdict of the jury or the decision of the judge (*People* v. *Carr,* 156 Cal.App.2d 462, 464 [319 P.2d 445] ; *People* v. *Janisse,* 162 Cal.App.2d 117, 122 [328 P.2d 11]), since a reviewing court is bound by the rule that even though it may arrive at a different conclusion, its function begins and ends when it finds substantial evidence in the record to support the verdict. (*People* v. *Blaydon,* 154 Cal.App.2d 817, 824 [317 P.2d 24].)

Turning to the case at bench in the light of these principles, we are convinced that the evidence which we have previously set out was sufficient to sustain Amis' conviction. It should be here pointed out that while Amis alludes to the preliminary transcript, such transcript has not been made a part of the record on appeal and we therefore have no way of knowing whether the alleged discrepancies in fact exist. Moreover, the record is not clear as to whether such inconsistencies were called to the attention of the jury. Suffice it to say, if they were, the effect thereof was for the jury's consideration. Insofar as the weight to be given Borquez' testimony, and the resolution of any conflicts therein, these were matters for the jury. Since Borquez' testimony is not inherently improbable we are here unable to alter the jury's determination.

(d) *The Propria Persona Contentions*

Amis presents several contentions in propria persona. One claim of error concerns the court's conduct with

respect to a juror. During the trial it developed that a juror may have spoken a few words to a prosecution witness and, in addition, there was speculation that the juror was intoxicated. The trial judge questioned the juror in chambers in the presence of counsel for both sides and both defendants. The judge elicited from the juror that she had left the elevator on the fifth floor by mistake, and that she talked to no one other than the elevator operator. After talking with the juror the judge was satisfied that the juror spoke coherently and that she was not intoxicated. Borquez was also questioned in chambers and he stated that he saw a woman enter the witness room, but he was not aware that she was a juror. He stated that the woman asked Van Raam, with whom Borquez was speaking at the time, whether he had been on jury duty. Both Van Raam and Borquez replied that they were policemen, and shortly thereafter they left the witness room. The bailiff, who reported seeing the same juror in the witness room, stated that when he talked with her he thought he detected the odor of alcohol. The questioning terminated and the judge stated that he thought the juror had acted in good faith. The prosecutor objected to the juror's continuing with the trial on the ground that if she could not recall talking to Van Raam and Borquez, she probably would not remember the evidence in the case. The trial court inquired of defense counsel and both defendants whether they had any objection to continuing the trial with this juror on the panel. Both defendants and their respective counsel replied that they had no objection.

Amis argues that the procedure violated the Sixth and Fourteenth Amendments of the federal Constitution and article I, section 7, of the California Constitution. He also argues that the waiver of an irregularity in the proceeding in chambers by himself and his counsel was not binding on him because it was not done in open court. Amis cites *People* v. *Kuranoff*, 100 Cal.App.2d 673 [224 P.2d 402], in support of his contention. *Kuranoff* contains no statement on the proposition for which it is purportedly cited as authority. We perceive no error in having permitted the juror to continue with the trial.

 The rule is that misconduct of jurors is subject to the discretion of the trial court, and a reviewing court will not reverse a judgment on asserted misconduct of a juror unless there is a clear abuse of discretion. (*People* v. *Maldonado*, 220 Cal.App.2d 923, 925 [34 Cal.Rptr. 311].) Here there was no abuse of discretion. The judge interviewed the

juror and was satisfied that no prejudice had occurred. Further, however, neither defendants nor their counsel objected to the court's determination of the issue at the time. Concurrence in the procedure followed by the trial judge implies a waiver of any objection, and consequently Amis cannot complain for the first time on appeal. The fact that the waiver did not occur in open court is irrelevant. The judge merely used his chambers for the questioning because court had not yet convened. It would have been merely formalistic for the judge to conduct the inquiry in the actual courtroom outside the presence of the other jurors, when it was equally appropriate to consider the matter in chambers.

Amis, citing *Wilson* v. *Schnettler,* 365 U.S. 381 [81 S.Ct. 632, 5 L.Ed.2d 620], also contends that inasmuch as all the evidence was obtained by federal agents, who were not working for the state, it was improper to bring this action in the state court. *Wilson* holds directly contrary to this proposition. There is no merit in this contention.

Amis' final contention is that it was error to mention a prior felony conviction. This argument is totally without merit. As said in *People* v. *Pike,* 58 Cal.2d 70, 93 [22 Cal. Rptr. 664, 372 P.2d 656] : "A defendant who chooses to take the witness stand in a criminal action thereby subjects himself to impeachment in the same manner as any other witness, including impeachment by proof of a prior felony conviction. The rule is not different where the defendant has admitted the prior conviction out of the presence of the jury in pleading to the indictment or information, notwithstanding the provisions of section 1025 of the Penal Code."

### Wilson's Appeal

In the opening brief presented by Wilson's court-appointed counsel the only claim of error urged was the trial court's refusal to grant the request for the continuance hereinbefore alluded to and discussed in connection with Amis' appeal. Two documents, entitled "New Issues of Appellant Wilson" and "The Closing Brief of Appellant Wilson" were, however, filed by Wilson, in propria persona. In these documents Wilson made additional claims of error, among which was the claim that the trial court erred in admitting into evidence certain incriminating statements made by him to a federal agent. The basis of this contention is that these statements were obtained without advising Wilson of his right to counsel or to remain silent in violation of *Escobedo* v. *Illinois,* 378

U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. In *Escobedo,* it was decided that once suspicion has focused on the accused and the authorities interrogate him for the purpose of obtaining incriminating statements, our adversary system begins to operate and the accused must be permitted consultation with an attorney, unless that right is intelligently waived; and that if the right to counsel is denied by the police, either by failing to respond to a request for counsel or by failing to inform the accused of such right, then the prosecution is precluded from using against the defendant the incriminating statements elicited from him by the police during such an accusatory investigation.

Following the decision in *Escobedo,* our California Supreme Court held in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], that it was error for a trial court to admit into evidence the confession of an accused when it was elicited under the following circumstances: (1) The investigation was no longer a general inquiry into an unsolved crime but had begun to focus on the defendant; (2) the defendant was in custody; (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements; and (4) the authorities had not effectively informed the defendant of his right to counsel or of his absolute right to remain silent, and no evidence established that he waived those rights. *Dorado* having been decided prior to the hearing of the present case, both counsel for Wilson and the People argued its applicability, as well as that of *Escobedo,* to the facts of the present case.

(a) *Applicability of Dorado and Escobedo*

As part of the prosecution's case-in-chief, Agent Yates of the Federal Bureau of Narcotics testified as to certain statements which Wilson made to him immediately following his arrest on September 19, 1962. According to Yates, Wilson admitted that he gave some bindles of heroin to Alexander, who in turn handed the heroin to Borquez.[7] Wilson

[7] Yates testified as follows: "BY MR. BARSOTTI: [Deputy District Attorney] Q. What was the conversation you had with Mr. Wilson at that time? A. I asked him who he had been talking to a few minutes before his arrest. He said he knew the party only as Johnny. I don't recall the exact question, asked something about narcotics and he first stated he didn't know anything about it. I said, 'Look, we have you for selling and would like to have your cooperation.' I said something, 'In fact, you made a sale to Borquez.' He said, no, he didn't make a sale to anyone. He admitted— THE COURT: One moment, please. Tell us in substance or words what was said. THE WITNESS: He said he had

also admitted cooperating with Amis in the sale to Borquez.[8] These statements clearly fall within the purview of *Dorado* and *Escobedo*. As to the first two requirements of the *Dorado* rule, namely, that the investigation have begun to focus on the defendant and that he be in custody, the recent case of *People* v. *Stewart*, 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], held in part that these two aspects of the accusatory stage defined by *Escobedo* and *Dorado* are fulfilled by the arrest of the defendant. Accordingly, since Wilson made his statements to Yates after he had been placed under arrest, we conclude that these two elements of the *Dorado* rule have been met in the instant case. In addition, the authorities had carried out a process of interrogation that lent itself to eliciting incriminating statements: Yates himself testified that upon arresting Wilson he "asked [him] something about narcotics and he first stated he didn't know anything about it. I said, 'Look, we have you for selling and would like to have your cooperation.' I said something, 'In fact, you made a sale to Borquez.'" At this point in the conversation Wilson made his incriminating statements. Finally, as to the fourth requirement of the *Dorado* rule, the record is barren of evidence showing that Wilson had been informed of his right to counsel or of his absolute right to remain silent or that he had waived these rights. In the face of a silent record a reviewing court cannot presume that the police informed a defendant of these rights, or that he waived such rights. (*People* v. *Stewart, supra,* 62 Cal.2d 571.)

---

met Johnny through someone by the name of Charles and he didn't know exactly where Charles lived. He lived in San Francisco and I believe he said something like Embarcadero or Marina Hotel. He stated he had—I believe I asked him, I said, 'And you gave this Charles some bindles in front of Johnny?' He said that he had and that he was present when this Johnny had handed—pardon me—Mr. Alexander handed them to Johnny. MR. BARSOTTI: Q. When you said in the early part of your conversation and made a reference to Johnny, to Mr. Borquez? A. Yes. Q. Did you refer to someone else at that time? A. I asked him who he had been talking to and he said Johnny, that is all he knew."

[8]The testimony by Yates was as follows: "Q. Was there any further conversation at the time or a later time regarding these offenses with Mr. Wilson? A. With Mr. Wilson? Yes, sir there was some more conversation at that time. I asked him—I don't remember the times. I can't remember the exact conversations. He said that he had introduced Johnny to another fellow and I can't remember at this point, I think he used the name Potts, but didn't know the man's first name. Then he said something to the effect that he went to 54th and Grove. I said, 'Johnny saw you at that location.' He first denied it and then said yes, and this party had told him to go to a service station, pick it up and bring it to this—it is a parking meter near 54th and Grove, and put it by this meter and that he had done so."

■■■■ In the light of the principles delared in *Dorado* and *Escobedo*, it was error for the trial court to admit into evidence the statements made by Wilson to Yates. Since these statements constituted confessions in that Wilson admitted participating in the transfers of the narcotics which took place on September 3 and September 10, 1962, "the error is necessarily prejudicial" and the conviction must be reversed as to Wilson. (*People* v. *Dorado, supra,* at p. 356.)

(b) *Wilson's Other Contentions*

Since the case must be reversed as to Wilson we need not discuss his remaining contentions, except to note that what we have already said in discussing Amis' appeal with regard to the trial court's refusal to grant the continuance would also be applicable to Wilson.

The judgment as to Amis is affirmed. The judgment as to Wilson is reversed. The purported appeals by both defendants from the order denying their motions for a new trial are dismissed.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied August 12, 1965, and the petition of appellant Amis for a hearing by the Supreme Court was denied September 8, 1965. Mosk, J., did not participate therein.