[Crim. No. 3039. Third Dist., Aug. 22, 1960.]

THE PEOPLE, Respondent, v. WYLEY R. VANDERBURG, Appellant.

*Assigned by Chairman of Judicial Council.

James P. Mower for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Edsel W. Haws and Nat A. Agliano, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—Defendant appeals from a judgment entered pursuant to a jury verdict finding him guilty of a violation of section 11500 of the Health and Safety Code, following an indictment of the grand jury charging him with unlawfully possessing, furnishing and giving away marijuana.

He does not contend that the evidence is insufficient to sustain the verdict of the jury, but seeks reversal because of alleged error in the receipt of inadmissible evidence, the cumulative effect of which he contends denied him a fair trial.

The state's principal witness, one Glen Miller, had for some time been an undercover agent for the sheriff's office, investigating the sale and use of narcotics in Stanislaus County. He testified that on the morning of January 22, 1959, in accordance with previous arrangements, he met Sergeant Gaylord, head of the narcotics division of the county sheriff's office; that with Gaylord observing him he went to the auto body shop operated by defendant; that he asked defendant if he could get some marijuana from him and the defendant replied that he had none but would take Miller to his home where he had a supply; that when they arrived there defendant produced a quantity of marijuana from which, at defendant's direction, Miller rolled a couple of cigarettes; that defendant refused to accept pay for the marijuana; that the two then returned to the shop and that he thereafter met Gaylord, to whom he gave the cigarettes. Miller's testimony was corroborated by Gaylord. The defendant took the stand in his own behalf and categorically denied that he gave any marijuana to Miller. Several friends and associates of defendant testified in his behalf. The sum total of their testimony was a flat contradiction of the testimony of Miller and of another state witness, one Kenneth Wilson, a deputy sheriff of Los Angeles County, who had participated with Miller and Gaylord in their investigation.

At the outset it is readily apparent that the evidence produced by the prosecution was sufficient to establish a prima facie case against the defendant. On the other hand, if the defendant and the witnesses who testified for him were believed by the jury defendant must have been acquitted. At a previous trial wherein the same witnesses appeared for the defense the jury failed to agree, but stood eleven to one for acquittal when discharged. Thus the issue of defendant's guilt turns solely upon the credibility of the witnesses on either side, for the evidence cannot be harmonized. One side or the other presented false testimony to the court. The matter of credibility, therefore, was decisive. The prosecuting attorney clearly realized this and from the beginning and throughout the proceedings made a determined attack upon the defense witnesses.

That the prosecuting attorney intended to attack defense witnesses and try the issue of their credibility was made apparent in his opening statement where, after summarizing the direct evidence that would be introduced to prove the appellant's guilt, he said: ''We will further show afterwards that Mr. Vanderburg called him [Miller] a stoolie and

threatened him when he discovered that this was the man that turned him in and squealed on him and that Mr. Vanderburg and his friends have been constantly engaged in the harassment of this man and his family and we will further show that they will blacken his character and many of Mr. Vanderburg's friends will be walking into this court room.''

■■■ The first defense witness testified that he had heard Miller ask defendant to sell marijuana for him and on being refused heard Miller ask defendant's permission to use defendant's shop for such sales. The prosecuting attorney, after first establishing that the witness and the defendant were good friends, abruptly asked the following question: ''Q. Did you try to buy some narcotics? A. No, sir, I didn't. Q. Are you certain?'' On objection that these matters could not be inquired into, the prosecuting attorney stated that he realized that but that his purpose was impeachment. Further objection that collateral matters could not be gone into for such purpose was made, and sustained by the court. Notwithstanding this early rebuff, the prosecuting attorney continued to attempt improper impeachment and thereafter succeeded in doing so. To state in detail the numerous instances of improper impeachment would require such extentive recitals of transcript content that space will not permit. We are compelled to summarize.

Another defense witness, one Leroy Hutson, testified on direct to having heard Miller on two different occasions tell defendant that he [Miller] had lied about him, ascribing his lies in one instance to the fact that Sergeant Gaylord was ''riding his back and he had to do it,'' and on the other occasion to merely having had ''good reasons to do so.'' On cross-examination the witness was asked if it was not a fact that Vanderburg had cursed Miller, called him a ''stoolie'' and told him ''what his mother was.'' The witness denied that such matters had occurred in his presence. Later on Miller was called in rebuttal and denied that he had ever told defendant he had lied about him. The following then occurred: ''Q. Will you tell the ladies and gentlemen of the Jury what was said at that time? A. I'd rather not come out and just flat say what he [appellant] said, sir, if I can get away from it. Q. This is a Court of Law. You tell these ladies and gentlemen of the Jury what he told you. A. It's pretty rough. [Defense Counsel]: Object to the witness' statement, Your Honor. The Court: . . . [To the witness] You'll have to state what was said. [Prosecuting Attorney]:

Would you please? . . . [Defense Counsel] . . . the statements are entirely out of order. Counsel for the Prosecution knows that. The Court: You may proceed. Would you answer now? [Prosecuting Attorney] : Q. Tell us what it was. A. He told me, 'Your mother must be a whore!' He said, 'She must mess with niggers and everybody else on the street,' and I think the last word he said, [the appellation which Miller asserted Vanderburg applied to him is too vile to print].''

Another defense witness, one James Robinson, testified on direct that he had known Miller to use narcotics and that Miller had stated to him he did use marijuana and could get it at any time he wanted it. On cross-examination he was asked as to any animosity he had towards Miller and he denied its existence. Thereupon the witness was asked if he did not have animosity towards Miller because of certain previous misconduct of the witness' brother. This was denied. The witness was then asked if it was not true that the witness' brother had sold dangerous drugs to "high school kids." Objection was interposed and the prosecuting attorney asserted that he was entitled to show animosity by the witness and his brother towards Miller. At this point the court expressed doubt as to the relevancy of these matters and the prosecuting attorney replied that he was trying to establish bias and prejudice against Miller because of what had happened to the witness' brother. Objection was then made that these matters should not be gone into because it was in effect trying another case. The objection was overruled. Thereupon it was brought out that Wilson and Miller had arrested the witness' brother for selling narcotics, that his case had been handled by the juvenile court and that he had been placed on probation. Motion to strike was denied. It was further shown that these matters occurred shortly after defendant had been arrested for the crime of possessing marijuana. The witness was then asked if it was not a fact that he disliked Miller because "Miller had caught your brother." The witness denied animosity arising out of those things.

A defense witness, George Mouser, on direct denied he had attended a marijuana party at which Miller had testified he had been present. He denied he had ever seen marijuana in defendant's possession and denied other parts of Miller's testimony. On cross-examination he was asked concerning his own activities in respect of narcotics. For example, the following occurred: "Q. You posed, did you not [to Miller],

that you had an aunt by the name of Grace who lived on 6th Street and could get plenty of this stuff? A. No, I don't have an aunt named Grace and I didn't tell Glen Miller. Q. Did you make a trip with Glen Miller and Dale Guttierriz to Los Angeles in February, this year, 1959, to make a buy? Didn't you get in the car with them and go to Los Angeles to try to make a buy? A. No. You've got me mixed up. Q. You are George Mouser? A. Yes. Q. You never went to Los Angeles? A. I went to Long Beach twice but not with Dale Guttierriz and Glen Miller. Q. You never told Kenneth Wilson you had a connection in L. A.? A. No." At this point defense counsel objected that the matters being inquired into were incompetent, irrelevant and immaterial. No ruling was made. The prosecuting attorney went on: "You know Kenneth Wilson? A. He was the guy with Glen Miller, yes. Q. Didn't you tell him you could get dope out of Los Angeles? . . . A. No. . . . Q. Didn't you boast your father had a trucking business— operated a trucking company and was trucking dangerous drugs from Oregon, they were being shipped it? A. No. Q. You are sure of that. A. Yes. Q. Didn't you tell him your aunt had a connection named Dago in Los Angeles, a good connection? A. No. . . . Q. On February 13th, 1959, do you recall being with Kenneth Wilson and Glen Miller?" Inquiries were then made of the witness concerning a trip allegedly made with Wilson, Miller and several other defense witnesses to a place where barbiturates were purchased. Later both Miller and Wilson were called in rebuttal and testified that Mouser had claimed to have an aunt named Grace who had a connection in Los Angeles and could obtain narcotics, that he had made a trip with Miller and one Guttierriz, another defense witness, for the purpose of buying narcotics, and that he had boasted that his father, a trucker, was dealing in narcotics, bringing them in from Oregon.

The foregoing course of conduct applied to all of the defense witnesses. All of such matters were wholly outside the scope of the direct examination, were asked under the guise of impeachment, and when criminal activities in respect of narcotics which were inquired about were denied affirmative testimony was introduced to prove such activities. But the inquiry into collateral matters, degrading to defense witnesses, was not even confined to the field of narcotics. By the same device of pretended impeachment, it was shown that one witness had been present with Miller in the home of the witness' brother-in-law during the investigation made by Miller con-

cerning the forging and uttering of fictitious checks through the use of a stolen check protector.

The prosecution's excursion into these collateral matters offended against the rule limiting cross-examination as stated in section 2048 of the Code of Civil Procedure as follows:

"The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith, ...."

It further offended against the rules limiting impeachment and stating the way in which a witness may be impeached as prescribed in section 2051 of the Code of Civil Procedure as follows:

"A witness may be impeached by the party against whom he was called, by contradictory evidence or by evidence that his general reputation for truth, honesty, or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony. ..."

As said in *People* v. *Harlan,* 133 Cal. 16 [65 P. 9]:

". . . Questions, on cross-examination, tending to show the general immorality of the witness, or specific acts of immorality, should never be allowed in any case for the mere purpose of discrediting or impeaching the witness. (*People* v. *Benc,* 130 Cal. 159 [62 P. 404]; *Sharon* v. *Sharon,* 79 Cal. 633 [22 P. 26, 131]; *People* v. *Hamblin,* 68 Cal. 101 [8 P. 687].) Nor can the immoral character of a witness, or specific acts of immorality, be shown by independent evidence for the purpose of impeaching a witness. The Code of Civil Procedure (§§ 2051 and 2052) prescribes the method of impeaching witnesses, and they can be impeached in no other than therein provided." (See also McBaine, California Evidence Manual, pp. 44-45, and Witkin's California Evidence, p. 685.)

As was said in *People* v. *Adams,* 76 Cal.App. 178, 184 [244 P. 106]:

". . . It is well settled that the guilt of a defendant on trial for an alleged crime cannot be established by proof of general bad character or of other crimes or wrongful acts which have no relevancy to the crime charged, nor may a witness be impeached 'by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony.' (Code Civ. Proc., § 2051.) This statutory rule is so clear and

certain that it is deemed unnecessary to cite any of the numerous cases holding that the statute means precisely what is stated therein.''

In a number of instances, some of which have been heretofore recounted, the prosecution, having cross-examined as to collateral and irrelevant matters, proceeded to prove affirmatively the matters denied by the witness. That this violated the well-settled rule requires little citation of authority, and we content ourselves with the statement contained in *People* v. *Chin Mook Sow*, 51 Cal. 597, 600, wherein the court said:

'' ' . . . And if a question is put to a witness on cross-examination which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked him the question; but it is conclusive against him.' '' (See also *Estate of Kasson*, 127 Cal. 496, 506 [59 P. 950], and *Sharon* v. *Sharon*, 79 Cal. 633, 673 [22 P. 26, 131].)

Nor can the conduct of the prosecuting attorney be justified on the plea which he so frequently and successfully made to the court that he was entitled to show a defense witness' hostility towards Miller by showing bias on the part of the defense witness. A witness may be impeached by showing bias for or against a party and interest in the outcome of the litigation and this because the motives of a witness may be important in evaluating his testimony. (Witkin, California Evidence, p. 688.) But ''for practical reasons . . . the inquiry for impeachment is usually confined to the *prominent* motives for untruthful testimony: *interest* in the suit which *necessarily* tends to bias, and *other circumstances* showing bias which are not too remote.'' (Witkin, *supra,* p. 688.) But these rules concerning interest in the outcome and bias for or against a party have no application to what was done here. Mere hostility towards a witness who appears for an opposing party is entirely too remote generally, and here specifically, to justify the degrading attacks made by the prosecution upon all of the defense witnesses. It is bias towards a party that counts and may be inquired into and even if under exceptional circumstances, not present here, there could be permitted an inquiry into the mere fact of the hostility of one witness towards another, it is obvious that the inquiry must be directed to the state of the witness' feelings. As said in *Estate of Martin,* 170 Cal. 657, 671 [151 P. 138]:

'' ' . . . [T]he provable fact is the state of the witness' feel-

ings, not the cause of it. That would probably lead to a multiplication of issues, and confusion of the minds of the jurors.' "

 A party must be allowed to subpoena and to produce on the witness stand any person who has knowledge of facts material to the issues being tried. He certainly cannot be expected to be ready to combat evidence that a witness sometime in his life has been a bad man, nor can a witness be reasonably subjected to such an abrupt and surprising attack. That is why matters affecting his morality and his past life are limited by the statute to evidence ''that his general reputation for truth, honesty, or integrity is bad'' and, conversely, ''that evidence may not be given of particular wrongful acts.''

Respondent seems to be aware of the wrongful conduct of the prosecution in the matters we have discussed and rather than denying they were wrongful insists that because precise objections were not made that the defendant may not complain here. That is a well-known salutary rule, but it will not in all cases justify a conviction arrived at by such methods. Apropos of this subject is the following quotation from *People* v. *Duvernay,* 43 Cal.App.2d 823, 828 [111 P.2d 659]:

''The conduct of the deputy district attorney as just narrated called for a more stern rebuke from the court, and it is doubtful whether any admonition to the jury would have removed the effect of such conduct. It would be an impeachment of the legal learning of counsel for the people to intimate that he did not know the aforesaid questions and argument to be improper, wholly unjustifiable, and peculiarly calculated to prejudice the substantial rights of the defendant. Such conduct prevents a defendant from having that fair and impartial trial to which, whether innocent or guilty, he is entitled. Moreover, it may defeat the punishment of crime by jeopardizing a conviction when a defendant is clearly guilty. The challenged remarks of the district attorney are wholly unsupported by the record, and go far beyond the scope of legitimate argument. It is obvious that they were injected into the case for the manifest purpose of prejudicing the jury against the defendant. Such remarks constituted misconduct, and of the fact that such misconduct was prejudicial there can be little doubt. To entertain a contrary view is to ignore human experience and the dictates of common sense. The prosecuting attorney may well be assumed to be a man of fair standing before the jury, and the members thereof may well have thought that he could prove the innuendo contained in the improper questions and the claims he made in his argument

concerning the characteristics of the defendant as indicating an addiction on the latter's part to the use of narcotics, had the prosecutor been allowed to do so.''

The foregoing was said concerning questions asked of a witness for the defense under the guise of showing interest of the witness. Specifically, the questions concerned narcotic activities by the witness, such as, ''Have you had trouble with the police officers in any way in connection with narcotics?'' and ''Have the police officers arrested you?''

Furthermore, the claim of waiver through failure to make precise objections is not applicable to the relation by the witness Miller of his vilification by the defendant nor to the far-reaching excursion into crimes involving the forging and uttering of checks, which we have related, for in both of these cases accurate and forceful objections were made. There can be no justification whatever for such conduct and the judgment must be reversed. The defendant was unfairly convicted and the unfairness was so extensive as to amount to a denial of due process.

For the reasons given, the judgment is reversed.

Peek, J., and Schottky, J., concurred.