48 Cal.Rptr. 596]

[Crim. No. 10587.   Second Dist., Div. Three.   Dec. 16, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD DAVID PEREZ, Defendant and Appellant.

Kate Whyner, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Leslie F. Bell, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—By information defendant was charged with a violation of section 4573.6 of the Penal Code (unauthorized possession of morphine while in the Los Angeles County Jail). After a court trial he was found guilty as charged and, being 18 years old at the time of his arrest, was committed to the Youth Authority under the provisions of section 1731.5 of the Welfare and Institutions Code. He appealed, requested the appointment of counsel on appeal and we appointed his present counsel, Miss Kate Whyner, who, as usual, has made a vigorous and astute effort on behalf of her client.

## The Facts

On August 6, 1964, defendant was an inmate of the Los Angeles County Jail. At about 9:45 a.m. Deputy Sheriff Canaga approached cell A-13 and observed defendant alone in the cell. It was not the cell which had been assigned to him, but it appears that at that time of day the cell doors were open and that defendant was not violating any rule simply by being in cell A-13. As Canaga approached the cell he saw defendant place a black object on a shelf with his right hand. With his left hand he appeared to put another object on the same shelf. Canaga then entered the cell, reached up onto the shelf and recovered an eyedropper with a needle and a bottle cap which was burned on the bottom. On a bed, in open view, he found a toothpaste tube which was opened on the bottom.

On the floor of the cell were about nine burned matches. Defendant had an empty match book cover on his person. He was wearing a long sleeved shirt with the left sleeve rolled up half way to the elbow. The right sleeve was down to his wrist. His "Identoband" which is placed on a prisoner's wrist, was pushed up toward his left elbow and was extremely tight on his arm. There was a small red mark on the arm midway between the shoulder and the elbow with a small bright red bloodclot in the middle. It appeared fresh. Later that morning when Canaga again observed the arm the area appeared bruised or abraded and the skin was broken.

The cell contained a washbasin with running water. When Canaga first saw the eyedropper it had a small amount of moisture on the inside and the bottle cap contained about a half teaspoonful of clear liquid.

No permission had been given to defendant to have any narcotics in the county jail.

Cross-examination of the officer revealed nothing pertinent to any of the points raised on appeal, except that it should be noted that over the prosecutor's objection defendant's counsel was permitted to try to develop that there were a number of persons who had access to cell A-13 and who were in the jail on some type of narcotics charge. He was not too successful. It also appeared from the cross-examination that Canaga saw a prisoner by the name of Gutierrez leave cell A-13 as he, Canaga, approached it. After Gutierrez left the cell he remained outside, looking in.

Sergeant Bullis, a deputy sheriff, received the eyedropper, the bottle cap and the tube from Canaga. To secure the fluid in the bottle cap he put some scotch tape across the top. This happened some time before 11 to 11:15 a.m. Through an intermediary the items were delivered to the sheriff's crime lab at about 12:15 p.m. and the contents of the bottle cap were subjected to an examination by Harry E. McKeehan, a forensic chemist.

The exact time when McKeehan made the examination does not appear from the record, but it was conducted on the same day. When he first viewed the contents of the cap, there was no liquid in it. The mystery whether Sergeant Bullis' seal proved inadequate or whether the fluid evaporated was never referred to at the trial except in the questioning by the court quoted later on. What McKeehan did observe was white powder residue adhering to the interior surface of the cap.[1] He scraped this substance from the cap and visually determined its quantity as being about a tenth of a gram, this being the equivalent of 1½ grains. The capacity of the gelatin capsule customarily used to package heroin in Los Angeles County equals that amount of powder. He performed three different color reaction tests on the substance, as well as crystalline reaction test and determined that the substance was morphine or a morphine derivative. The crystalline structure test showed the crystalline figures characteristic of mor-

---

[1] On cross-examination he described it more fully. "It was a white powder, rather, as I remember, it had a kind of a tacky consistency to it, crystalline."

phine. He was unable to state what percentage of the substance was morphine and what percentage was milk sugar, which is generally mixed with morphine in a proportion of one part morphine to nine parts milk sugar, but there was enough morphine to give him what he called ''a good substantial test.''

After both counsel had announced that they had no further questions of McKeehan the colloquy quoted in the footnote took place between the court and the witness.[2]

The defense consisted of testimony by the prisoner Gutierrez to the effect that before Canaga entered the cell he had observed defendant sitting on a bunk reading a book and had seen another inmate, dressed in white, in the cell. When Canaga entered, this inmate ran out of the cell. He had been doing something in connection with the shelf in question. Defendant remained on the bunk until Canaga entered. The other inmate was never identified.

Defendant testified to the effect that he was sitting on a bunk leafing through a book when Canaga entered, approached the shelf and asked him about the articles he found there. He denied having placed them on the shelf and also testified to the presence of the unidentified inmate, to whom he had not been paying any particular attention. As soon as Canaga entered, this person got up and he ''shot out of the cell.'' The mark on the arm was explained as a mosquito bite which he later scratched. He claimed to have been wearing a short sleeved shirt and denied that the identoband was not on his wrist.

### SUFFICIENCY OF THE EVIDENCE

■ Appellant claims that the evidence is insufficient to support the conviction. Exclusive reliance is placed on

---

[2] ''THE COURT: Mr. McKeehan, you were asked some questions with reference to the use of milk sugar. In order to make this preparation, do you use some milk sugar—that is, the preparation of morphine, or a morphine derivative—do you generally use some milk sugar mixed with water? THE WITNESS: To make the powder, to put it in the cap, the two powders, heroin and the sugar, are put together and just mixed. Then when it is to be injected, the cap is then emptied into a spoon, or something like that, a bottle cap, and a little heat applied to it, and sometimes a little piece of cotton is put in the bottom of the cap and then the liquid is drawn up through the cotton into some kind of a hypodermic apparatus. THE COURT: The liquid is drawn into the cotton, so you wouldn.'t expect to find any liquid remaining in, say, the bottom of the bottle cap? THE WITNESS: Well, it would be wet, or you could, yes. THE COURT: How long would it take for that moisture, say, to evaporate? THE WITNESS: Oh, well, that would depend, I guess, on the temperature and that sort of thing. I don't know.''

*People* v. *Aguilar,* 223 Cal.App.2d 119 [35 Cal.Rptr. 516]. In *Aguilar,* when defendant was arrested a narcotics outfit was found in his possession. After the arrest he referred to the paraphernalia found as "nothing . . . but an outfit" and admitted that he was an addict. A forensic chemist testified at the trial that scrapings from two spoons which he described as "debris" contained heroin. The court accepted counsel's description of the debris as "miniscule, unrecognizable scrapings," as a "detectable trace" and itself characterized them as being of such a nature that the "narcotic was imperceptible to the human eye and its presence, qualitatively and quantitatively, could be detected only with the aid of a forensic chemist and laboratory." It held that the evidence was not sufficient to sustain a conviction of known possession of the narcotic.

*Aguilar* has been the subject of conflicting interpretations by various divisions of several District Courts of Appeals of this state. (See *People* v. *Sullivan,* 234 Cal.App.2d 562 [44 Cal.Rptr. 524], particularly the concurring opinion by Justice Herndon; *People* v. *McCarthy,* (Cal.App.) 46 Cal.Rptr. 805, following the concurring opinion in *Sullivan; People* v. *Wilson,* 235 Cal.App.2d 266 [45 Cal.Rptr. 267], explaining *Aguilar* in a manner possibly not agreeable to the authors thereof.) The entire problem is now before the Supreme Court. (*People* v. *Leal,* 2d Crim. No. 9827, filed July 9, 1965, hearing granted September 2, 1965.)

If this were a case which involved the facts of *Aguilar* we probably would have deferred submission of this matter until the Supreme Court speaks definitively in *Leal.* It appears to us, however, that even the most extreme interpretation of *Aguilar* does not bring the facts of the present case within it. Defendant was prosecuted for possession of what was seized by Canaga, not what was delivered to McKeehan. He was found in possession of a mixture of morphine, some other substance, possibly milk sugar, and a liquid, probably water, ready for injection. Although defendant apparently had already given himself an injection, an adequate amount for another was left in the cap. In the cases following *Aguilar* (*People* v. *White,* 231 Cal.App.2d 82 [41 Cal.Rptr. 604]; *People* v. *Sullivan, supra*; and *People* v. *Melendez,* 225 Cal. App.2d 67 [37 Cal.Rptr. 126]) the container, upon discovery,

showed nothing but the inevitable remains after a complete use of its former narcotic contents.

### ALLEGED MISCONDUCT OF DISTRICT ATTORNEY

The prosecutor started his cross-examination of Gutierrez by asking him whether he was a drug addict and used heroin. Without any objection being made by defendant's counsel, he received a couple of evasive replies and eventually a denial. A question as to whether Gutierrez had ever used heroin was first avoided by him and then, after he was cautioned by the court, not answered because of possible incrimination. The court was apparently not impressed by the whole line of questioning because it inquired of the prosecutor concerning the relevancy thereof. The prosecutor then indicated that he had a suspicion that Gutierrez was under the influence at the time he was testifying. It was then that defense counsel made his first objection "to this course of conduct." The objection was very properly overruled. Cross-examination, whether or not the witness is under the influence of narcotics while testifying, is admissible. (See authorities collected in 16 So.Cal.L.Rev., p. 333; *People* v. *Haydon,* 18 Cal.App. 543, 563 [123 P. 1102, 1114] (drunkenness during trial); *People* v. *Buono,* 191 Cal.App.2d 203, 233 [12 Cal.Rptr. 604] (witness under influence of narcotic when testifying—dictum).)

The cross-examination then went on to other matters, but the court did indicate that if the prosecutor wished to have Gutierrez examined to determine whether he was presently under the influence of some narcotic, that could be done, but not in open court.

Later after defendant had rested his case, the prosecution called Deputy Farrington, qualified him as an expert in narcotics matters, established that he had examined Gutierrez, but when he tried to delve into the results of the examination, the court had apparently changed its mind about the materiality of the results and made and sustained its own objection to any further testimony.

Little need be said on this point: this was a case tried to a court, not to a jury. There is no evidence whatever of any bad faith on the part of the prosecutor. When he started his cross-examination he evidently intended to prove lack of credibility because of addiction. This is permissible, particularly where it is done only by cross-examination of the witness. (*People* v. *Bell,* 138 Cal.App.2d 7 [291 P.2d 150].) It has

even been said that proof of addiction alone, without further proof on how addiction affects credibility, is permissible impeachment within the discretion of the trial court. (*People* v. *Buono,* 191 Cal.App.2d 203, 232 [12 Cal.Rptr. 604]; 3 Wigmore, Evidence (3d ed. 1940) § 934, p. 481; McCormick on Evidence, § 45; 16 So.Cal.L.Rev., p. 333.) Being effectively blocked along this line of inquiry by Gutierrez's denial he then turned to the matter of his being under the influence of drugs while testifying and was prevented from proving anything by the court's own objection. This is an entirely different situation from that presented by *People* v. *Perez,* 58 Cal.2d 229, 240 [23 Cal.Rptr. 569, 373 P.2d 617], relied on by defendant. There the prosecutor asked a witness for the defendant, in front of a jury, whether he had been threatened without there being any evidence in the record that the question was asked in good faith. This was followed by argument to the jury which repeated the insinuation carried by the question. We are satisfied that the prosecutor acted in good faith and that, in any event, since the trial was to an experienced judge no harm resulted to defendant.

### ALLEGED ERROR IN SENTENCING

Defendant presents a lengthy argument concerning alleged error in sentencing and failure to exercise judicial discretion under section 1202b of the Penal Code. The argument is beside the point. Defendant was committed to the California Youth Authority, a commitment which is for an indeterminate duration. (Welf. & Inst. Code, §§ 1766, 1771.)

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 9, 1966.