[Crim. Nos. 16294, 16552. Second Dist., Div. Two. Dec. 19, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
JAKE ORLANDO ORTEGA et al., Defendants and Appellants.

(Two Cases.)

## COUNSEL

Albert D. Silverman and Leon S. Paule, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and Arthur B. Rosenfeld, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, J.**—Appellants, Jake Orlando Ortega and Floyd Dan Rodriguez, were jointly charged with a violation of section 211 of the Penal Code (robbery). The information alleged that both appellants were armed with deadly weapons, to wit, guns, at the time of the commission of the offense. Both men entered pleas of not guilty and each made a motion for severance of trial which motions were denied. At a trial by jury appellants were found guilty as charged and the robbery was fixed as in the first degree. The jury further found that each appellant was armed with a deadly weapon at the time of the commission of the offense. Motions for new trial were made and the motion was denied as to appellant Ortega and was withdrawn as to appellant Rodriguez. Applications for probation were denied and appellants were sentenced to the state prison for the terms prescribed by law. This appeal is from the judgments of conviction.

### Statement of Facts

On June 7, 1968, at approximately 9:15 p.m., two men entered the L & B Delicatessen, owned and operated by Robert G. Long, and walked to the rear of the store to the refrigerator where beer was stored. One of the men asked the price of Pabst beer and Long became suspicious of the

men as prices of beer were conspicuously posted. Because of the behavior of the two men, Long paid particular attention to their faces. There was a mirror over the refrigerator which permitted Long to observe the men in the well-lighted store. Neither man wore any covering over his face. One man identified by Long as Rodriguez took a six pack of beer and with his confederate later identified by Long as Ortega approached Long who was at the counter. As Long rang up the amount of the purported purchase on the cash register Rodriguez asked for a pack of cigarettes. Long turned to secure the cigarettes at which time he heard a revolver being cocked. When he turned toward the two men he saw that both were holding revolvers and pointing the same at him. One of the men then ordered Long to move to the rear of the room and after complying Long was forced to lie on the floor at which time one man took Long's wallet and also kicked him. Thereafter, the two men left the store.

Long discovered that $230.50 had been taken from the cash register and in addition a cigar box containing rolled coins was missing. Certain of the rolled coins bore a stamp, "L & B Delicatessen, 2545 East Broadway, Long Beach."

On the following evening, June 8, 1968, at about 8 p.m. a call came over the sheriff's radio to the effect that a robbery was in progress at 111th and Freeman. Jesse Simpson, a deputy sheriff, and his partner Deputy Fauria responded to the call and upon arriving at the specified location observed a 1967 Chevrolet with Rodriguez seated in the driver's seat and Ortega in the right rear seat. A third individual, C. DeBaca, was also in the vehicle while a fourth person, Richard Edward Aiken, was in a nearby telephone booth making a call. Shortly thereafter other officers arrived at the scene. One officer, Deputy Sheriff Robert J. Begey, ordered the three men from the car and a patdown for weapons took place. No weapons were found. The doors of the vehicle were left open and Begey observed a wallet on the floor and inquired of the three suspects as to the ownership of the same. Each denied that he was the owner of the wallet. The officer bent over to scrutinize the operator's license which was protruding from the wallet and he observed that the picture on the license was of a different person from any of the suspects. The name "Long" appeared thereon. Begey then picked up the wallet which contained business cards, a Masonic card and an armed services identification card, all the property of Long. As Begey was stooping down to pick up the wallet he observed the grip of a .38 caliber pistol under the seat. A search of the car followed and the officers further recovered a .22 caliber pistol and rolled coins bearing the stamp of L & B Delicatessen. The three suspects in the car and the fourth man in the telephone booth were all placed under arrest.

Long attended a police lineup on the Monday following the Friday rob-

bery at which time he was able to make positive identification of Rodriguez and "tentative" identification of Ortega. Long positively identified Ortega at both the preliminary hearing and at trial where he had an opportunity to observe the said appellant at close range. Also at trial Long was able to identify certain rolled coins bearing the stamp of his delicatessen, a 1928 G series $2.00 bill, a bag of value balloons of the type sold at his store and his wallet and its contents. Long, having had considerable experience with firearms while in military service, was able to identify two weapons introduced by the People and taken from Ortega and Rodriguez at the time of their arrest as similar to those carried by the two men during the robbery.

Ortega's defense was alibi and in connection therewith several witnesses were called who testified that said appellant was at the home of Richard Edward Aiken on the evening that the robbery of the delicatessen took place. Ortega took the stand and testified on his own behalf. In addition to giving testimony which if believed by the jury would have established an alibi, said appellant testified that while he and Rodriguez were together in the Long Beach city jail, Rodriguez stated that he would tell the police the truth which was that he (Rodriguez) and his cousin Junior Solano were in fact the perpetrators of the robbery of Long and that Ortega was not involved in the commission of the crime.

Rodriguez also took the stand in his own behalf, denied any participation in the robbery, denied that he had told Ortega that he (Rodriguez) and Solano had committed the robberies. He further testified that Ortega on several occasions had asked him to take the blame for the robbery as the police had the stronger case against Rodriguez. He admitted ownership of the vehicle in which he was seated at the time of his arrest. He denied any knowledge of the presence of the weapons in his car. He testified also that he had secured the rolls of coins found in the glove compartment from a bank so that he would have the small change available for gambling and the purchase of cokes and such. He could not name or furnish the location of the bank where he had secured the rolls. He also testified that he had a $2.00 bill which he had retained as a good luck token.

Aiken, the individual who was making the telephone call at the time of the arrest of appellants, appeared as an alibi witness for Ortega and on cross-examination denied that he had ever been addicted to "hard" narcotics such as morphine, opium or heroin. On rebuttal, Deputy Sheriff E. Adrian LaGrave who qualified as a narcotics expert, testified that he had talked with Aiken on June 10, 1968, and had examined him physically. LaGrave found several marks on Aiken's arms and based upon his examination and conversation with Aiken, LaGrave formed the opinion that Aiken was addicted to the use of heroin.

## The Rodriguez Appeal

Appellant Rodriguez contends as follows:

1. That here was no probable cause for his arrest;

2. That there was no corroboration to support testimony that a police code call of "211 now" was actually made or validly issued;

3. That the court committed prejudicial error in permitting witness Ann Long to testify;

4. That the court committed prejudicial error in admitting testimony regarding a telephone call by witness Aiken concerning narcotics;

5. That the court improperly influenced the jury in reaching a verdict; and

6. That appellant was given multiple punishment proscribed by section 654 of the Penal Code.

### 1. *Probable Cause For The Arrest Issue*

Appellant contends that his arrest was illegal because it was effected without probable cause. It should be noted that appellant failed to move under section 995[1] of the Penal Code to set aside the information on the ground of lack of probable cause. ▇ As stated by the court in *People v. Harris,* 67 Cal.2d 866, 870 [64 Cal.Rptr. 313, 434 P.2d 609], "We hold that the failure to move to set aside the information (Pen. Code, § 995) bars the defense from questioning on appeal any irregularity in the preliminary examination (Pen. Code, § 996). We thereby follow a long line of decisions in both this court and the Courts of Appeal, uniformly holding that section 996 forecloses an attack on the preliminary examination in the absence of a motion under section 995. [Citations.]" Thus, since appellant failed to move to set aside the information, he is precluded from raising the issue on appeal.

Appellant's brief, however, couples the issue of admissibility into evidence of several items recovered from his car with the issue of probable cause. For that reason we deem it necessary to determine whether there was probable cause for his arrest.

▇ The sheriff's deputies, Simpson and Begey, were each responding

---

[1]Section 995 provides in relevant part: "The indictment or information must be set aside by the court in which the defendant is arraigned, upon his motion, in either of the following cases: . . . If it be an information: . . . 2. That the defendant had been committed without reasonable or probable cause." Section 996 provides in full: "If the motion to set aside the indictment or information is not made, the defendant is precluded from afterwards taking the objections mentioned in the last section [995]."

to an official police call to investigate a robbery then in progress. When the officers arrived at the designated location the only automobile present at the scene which matched in any way the description given in the radio call was the one in which the two appellants and a third party were seated. Under the circumstances the officers had a duty to investigate all suspicious activities even though at that moment there was no probable cause to make an arrest or a search of the persons or the automobile. There was nothing improper in the detention of the suspects for questioning or in requiring them to leave the car so that a weapons patdown could be made.

At the time the occupants alighted from the vehicle, Begey was able to see Long's wallet on the floor near the driver's seat where Rodriguez had been sitting. The deputy was outside the car; the wallet was in plain sight. Each of the three suspects denied ownership of the wallet. While still outside the automobile Begey was able to observe that the photograph on the operator's license protruding from the wallet was not a likeness of any of the three men who had been in the vehicle. As yet there had been no search ". . . for the reason that it is not a search merely to observe that which is in plain view [citations]." (*People* v. *Bloom,* 270 Cal.App.2d 731, 735 [76 Cal.Rptr. 137].)

Upon Begey ascertaining that the license and the wallet did not belong to any of the suspects, he had reasonable cause to believe the wallet had been taken in the perpetration of a robbery. He was then justified in reaching into the automobile to retrieve the articles. As Begey reached into the vehicle to pick up the wallet and operator's license, he also observed the grip of a hand weapon under the front seat. As stated by the Supreme Court of California, ". . . we have consistently held that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning. . . . Should the investigation then reveal probable cause to make an arrest, the officer may arrest the suspect and conduct a reasonable incidental search. [Citations.]" (*People* v. *Mickelson,* 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658].)

The officer's investigation assuredly furnished probable cause to arrest appellant. The search of the vehicle was proper though warrantless and though it actually preceded the arrests in time. A search contemporaneous to a valid arrest has been repeatedly sustained by the courts and it is of no significance if the search preceded or followed the arrest. (*People* v. *Cockrell,* 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116].)

We hold that there was probable cause to effect the arrest of appellant and that the search of the automobile which followed was reasonable and

proper. It necessarily follows that the items recovered in a search incident to and contemporaneous with the lawful arrest were admissible in the trial of appellant.

## 2. *Corroboration of Testimony of Police Radio Call Issue.*

■ Appellant contends that neither the court nor any counsel made any effort to determine or verify the validity of the code call "211 now" (robbery in progress) and such lack of corroboration deprived appellant of due process of the law. No authority is cited to support appellant's position and we know of no legal requirement that each item of testimony offered by the prosecution must be supported by corroborative evidence. Several officers riding in separate vehicles testified to receipt of the radio call and responding thereto. The officers were subjected to intensive cross-examination. No objection was made at the trial to the effect that no such radio code call was made or, if it was made, that it was not a valid call. This meritless issue cannot be raised for the first time on appeal.

## 3. *Testimony of Witness Ann Long Issue.*

■ At the beginning of the trial, counsel for Ortega made a motion which the court granted to exclude all witnesses from the courtroom during the proceedings. Mrs. Ann Long, the wife of the victim, Robert G. Long, was in the courtroom when the order was made and as she had not been a witness to the robbery or any other incidents, the People indicated that they did not intend to call her to testify. For that reason she was not included in the exclusion order and remained in the courtroom during some or all of the trial proceedings.

Long testified that his wallet had been taken from him during the robbery but he did not state when he first discovered the same to be missing. Certain witnesses for the appellants indicated by their testimony that Long had been told by the police of the loss of the wallet only after the four suspects had been taken into custody. As a rebuttal witness the court, over objection by counsel for Ortega, permitted the victim's wife to testify that on the night of and after the robbery, Long discovered that his wallet was missing. After a fruitless search of the home and the delicatessen, Long telephoned the police and reported to them that his wallet and its contents had also been taken in the robbery. Rodriguez contends that the trial court committed prejudicial error in permitting Mrs. Long to testify. We do not agree.

It would, perhaps, have been better trial procedure for the People to recall Long and ascertain from him the relevant facts concerning the time

of the discovery of the loss. However, as stated in *People* v. *Wright*, 216 Cal.App.2d 866, 871 [31 Cal.Rptr. 432], "But the objection was made by counsel for another defendant (Malone), and it is recognized that one cannot take advantage on appeal of objections made by counsel for another defendant in the absence of some stipulation or understanding to that effect —and here there was none. [Citation.]" In the case at bar there was also no such stipulation or understanding. As appellant did not raise an objection in his own behalf separate and apart from the objection raised by counsel for Ortega, we are of the opinion that the issue is waived on appeal.

■ Even more fundamental is the rule that in a criminal case the violation of an order excluding witnesses from the courtroom does not render the witnesses incompetent to testify nor does it furnish grounds to refuse permission to testify. (See *People* v. *Tanner*, 77 Cal.App.2d 181, 187 [175 P.2d 26].) This is a matter that lies within the sound discretion of the trial judge. (See *People* v. *Willingham*,[2] 271 Cal.App.2d 562, 572 [76 Cal.Rptr. 760]; *People* v. *Persky*, 167 Cal.App.2d 134, 139 [334 P.2d 219]; Evid. Code § 777.) There was no abuse of discretion by the trial judge.

### 4. *Testimony of Witness Aiken Issue.*

■ Richard E. Aiken, who was arrested with the two appellants, was called by Ortega as an alibi witness. At the time of the apprehension of the suspects Aiken was making a telephone call from a booth near the location where Rodriguez' car was parked. At the trial, Aiken on direct examination testified only to the effect that on the night of and at the time of the robbery, Ortega was with the witness at the latter's apartment. On cross-examination the prosecution at great length and over the objections of counsel for Ortega questioned Aiken as to the content of his telephone conversation on the night of the arrest. The prosecution insisted that the purpose of the inquiry was to impeach Aiken by showing that he was in the process of calling his "connection" for the purpose of making a narcotics purchase.

We are aware that wide latitude is allowed in cross-examination although we entertain serious doubts as to the propriety of the line of questions directed by the People to the witness Aiken. The issue of the impropriety, if any, is unavailable to appellant Rodriguez. As stated in *People* v. *De Santiago*, 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353], "It is the general rule, of course, that questions relating to the admissibility

---

[2] Hearing denied by the Supreme Court, June 4, 1969.

of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal. [Citation.]" The record reflects that counsel for appellant Rodriguez made no objection to the inquiries of the deputy district attorney and for the reason stated in *People* v. *Wright, supra,* he cannot take advantage on appeal of an objection made by counsel for another defendant in the absence of a stipulation or understanding to that effect.

We must also mention that any testimony which would tend to impeach the credibility of the witness Aiken would surely accrue to the benefit of Rodriguez. The record reflects that it was Aiken who made several unsuccessful attempts to induce Rodriguez to enter a plea of guilty, implicate a cousin of appellant in the perpetration of the robbery and absolve Ortega. Under such circumstances Rodriguez was benefited rather than prejudiced by the prosecution's attempt to impeach the witness.

5. *Improper Influencing Jury Issue.*

█ Appellant Rodriguez further contends that the trial court improperly influenced the jury's verdict. We do not agree.

At approximately 5 p.m. after a day of deliberation the jury returned to the courtroom and the following colloquy between the trial judge and the foreman of the jury took place:

"THE COURT: Have you been able to reach a verdict as to either of the defendants? THE FOREMAN: Yes, on one, sir. THE COURT: On one only? THE FOREMAN: Yes, sir. THE COURT: What probability is there that you may be able to reach a verdict on the other defendant? THE FOREMAN: May I state the one word, reason for the inability to reach a decision on the one defendant, so that I might have a description of it? THE COURT: I don't quite understand what you mean. THE FOREMAN: The word is 'tentative,' the true meaning of the word 'tentative'. THE COURT: I could give you Webster's definition, but assuming you had the definition and clearly understood it, do you think there is a reasonable probability that you can agree on a verdict? THE FOREMAN: Not until the full meaning of the word 'tentative' which was brought up in the testimony, is brought out, the difference between the word 'tentative' and 'positive'."

Thereafter the court read to the jury a definition of the word "tentative" as set forth in Webster's International Dictionary, Second Edition, unabridged, and the jury retired for further deliberation. At 5:50 p.m. the jury again returned to the courtroom where the following additional colloquy occurred:

"THE COURT: All right. I am going to read you a statement, which is

generally accepted as being a reasonable statement, then I am going to adjourn until tomorrow. In the meantime, you will be in Mr. Jones' care. But I read this to you at this time because I think it is worthy of your consideration. First, let me ask you, how many ballots have you taken, if you know? THE FOREMAN: This last sitting, I would say two. THE COURT: All right. Now, listen carefully because I don't want any confusion, *without telling me whether it was for or against conviction or acquittal,* I would like to know how you stood on the last ballot, and what I want is merely numbers, such as six to six, nine to three, ten to two. THE FOREMAN: Your Honor, ten to two." (Italics added.)

The court next read to the jury a long statement[3] which was identical to that given by the trial judge in *People* v. *Baumgartner,* 166 Cal.App.2d 103, 105-106 [332 P.2d 366], and in *People* v. *Barnes,* 210 Cal.App.2d 740 [26 Cal.Rptr. 793].

The jury then retired for the night, returned to the jury room the following morning at 9 a.m. and continued their deliberations until 11 a.m. At that time the court was informed that the jury had arrived at verdicts as to both defendants.

---

[3]"THE COURT: In a large proportion of cases and perhaps strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions and not a mere acquiesence in the conclusion of his or her fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view, it is your duty to decide the case, if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other in all cases. In the present case, the burden of proof is on the People of the State of California to establish every part of it beyond a reasonable doubt. And if in any part of it you are left in doubt, the defendant is entitled to the benefit of the doubt and must be acquitted. But in conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments. And on the other hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself and to have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath. And on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows. That is given to you as a suggestion of the theory and rationale behind jurors coming to a decision one way or the other."

As the court in *People* v. *Barnes, supra,* at pages 747-748, points out:

"Appellant Self urges that the court's instruction was coercive and constituted prejudicial error. He relies upon this court's decision in *People* v. *Baumgartner,* 166 Cal.App.2d 103 [332 P.2d 366], in which this court held that an identical instruction was ground for reversal.

"However, as pointed out by respondent, the circumstances under which the instruction was given in the instant case at bench were vitally different from those found in the *Baumgartner* case. There, the fatal prelude to the instruction was the jury foreman's statement to the court in the presence of the jury that they stood 11 to 1 *for conviction*. The aftermath was a verdict of guilty in 40 minutes when the jury had been deliberating for 6 hours.

"In the *Baumgartner* case the record showed that the court knew that the jury stood 11 to 1 for conviction and this court held that the giving of the instruction amounted to coercion and was error. However, this court went on to say: 'It should be said that the instruction was proper and apt enough had the court not been informed to the knowledge of all as to the fact that the jury stood 11 to 1 for conviction. In such situations the instruction used was worked out long ago as to form and has been frequently used.' "

In the cause before this court, as in *Barnes, supra,* the trial court was unaware as to whether the jury stood 10 to 2 for acquittal or for conviction. After the reading of the challenged statement the jury was not required to deliberate further. It was only after a night's rest and several additional hours of deliberation that unanimous verdicts were returned. We do not believe that the court committed prejudicial error in giving the instruction of which appellant complains.

We cannot with certainty know as to which of the two defendants that the jury had reached a verdict before their initial return to the courtroom. However, the foreman indicated that the jury requested an instruction defining the distinction between the words "tentative" and "positive." It is perhaps more than coincidental that throughout the record the victim Long repeatedly used the word "tentative" in describing his identification of Ortega and used the word "positive" in describing his identification of Rodriguez.

6. *The Multiple Punishment Issue.*

Lastly appellant contends that the inclusion in the judgment of a finding to the effect that he was armed with a deadly weapon, to wit, a gun, at the time of the commission of the robbery subjects him to double punish-

ment as proscribed in section 654 of the Penal Code. This issue was disposed of definitively by our Supreme Court in *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862].

*Floyd* requires that the conviction of the robbery count be modified to provide that at the time of the commission of the offense, sections 3024 and 12022 of the Penal Code were inapplicable but appellant was armed within the meaning of section 1203 of the Penal Code. Further, the judgment must be modified to specify the nature of the weapon. The judgment in this cause will be modified accordingly and the weapon will be specified as a gun.

The evidence of the guilt of Rodriguez was overwhelming. Not only was he positively identified by the victim Long as one of the perpetrators of the robbery but at the time of his apprehension he had in his immediate possession many of the fruits of his crime—Long's wallet and its contents, the rolls of coins bearing the stamp of the delicatessen, the $2.00 bill. Under the car seat occupied by him was a hand weapon similar to the one carried by him at the time of the commission of the offense. The judgment of conviction as hereinafter modified is affirmed.

### The Ortega Appeal

Ortega has presented on appeal seven separate contentions. We will limit our discussion to the error which we deem to have been so prejudicial as to require reversal of the judgment as to this appellant. The other errors complained of are unlikely to recur at retrial.

As previously indicated Ortega's defense was one of alibi and in support thereof he called as witnesses Richard E. Aiken (Aiken), Saeda Aiken and John Thomas Gallagher. In addition, Ortega testified in his own behalf. All four of these witnesses testified that on the night of and at the time of the robbery Ortega was visiting at the apartment of Aiken which was located many miles from the scene where the offense occurred. This would have made appellant's participation in the crime an impossibility.

In our discussion of the appeal of Rodriguez, *supra,* we have briefly alluded to the impropriety of the attempted cross-examination of Aiken concerning the content of his telephone conversation at the time of and at the scene of the arrests. Over objection of counsel for Ortega, Aiken was asked and answered in the presence of the jury several questions[4] which were beyond the scope of the direct examination and were directed to

---

[4]"Q. [By Deputy District Attorney] Hadn't you told Deputy Cueva that you were phoning your connection? A. No, I did not. Q. Hadn't you told him that you had chipped in $60.00 with those guys and you were getting a quarter ounce to fix? A. No, sir."

collateral and irrelevant matters. Under the guise of impeachment the prosecution asked questions, the purpose of which could only be to degrade the witness. (See *People* v. *Vanderburg,* 184 Cal.App.2d 33 [7 Cal.Rptr. 287].) Upon renewal of objection by counsel for Ortega to the line of questioning being pursued by the prosecution, the trial court precluded further inquiry.

Had the subject of Aiken's use of narcotics ceased at this point and if proper admonition had been given to the jury it is unlikely that the error would have been so prejudicial as to require reversal. The prosecution, however, using a different approach, shortly thereafter returned to the same subject matter and over objection of counsel, sought to impeach the witness Aiken on the sole basis that he was a narcotic addict. To buttress his contention that such inquiry was permissible the deputy district attorney relied on and cited to the court the case of *People* v. *Perez,* 239 Cal.App.2d 1 at page 6 [48 Cal.Rptr. 596]. A careful reading of that decision clearly indicates that such reliance was misplaced.

*Perez* involved a charge of unauthorized possession of morphine while in custody in a county jail. The matter was heard as a court trial. A witness, Gutierrez, testified on behalf of the defendant and without objection being made by defendant's counsel answered in the negative the prosecution's question as to whether he was a narcotic addict. When the prosecution inquired further of Gutierrez if he had ever used heroin, the court cautioned the witness and he refused to answer because of possible self-incrimination. The trial court was not impressed by the line of questioning and inquired of the prosecution as to the relevancy thereof. The prosecution indicated to the court that he had "a suspicion that Gutierrez was under the influence at the time he was testifying." (*Perez,* at p. 6.) Defense counsel for the first time made an objection and the same was properly overruled. The trial court then inquired if the prosecution desired to have Gutierrez examined by an expert to determine if he was presently under the influence of some narcotic. Later in the trial when the expert who had examined Gutierrez was called as a witness the trial judge apparently had changed his mind about the materiality of the tests and foreclosed any further testimony on the subject.

If *Perez* is analyzed, it is apparent that it cannot support the broad assertion of the prosecution in the cause before this court that *proof of narcotic addiction standing alone* is admissible to impeach the credibility of a witness. The trial court and the prosecution relied upon certain language[5] in *Perez* which was not determinative of the issues therein presented.

---

[5]In *Perez,* at pages 6 and 7, the court stated as follows: "When he [the prosecutor] started his cross-examination he evidently intended to prove lack of credibility because of addiction. This is permissible, particularly where it is done by cross-examination

The cases cited in *Perez* are all clearly distinguishable from the case at bar. *People* v. *Bell,* 138 Cal.App.2d 7 [291 P.2d 150], involved a charge of pandering. The prosecutrix, who was an inmate of a house of prostitution, was asked on cross-examination about her use of heroin. "During this cross-examination, the trial court consistently ruled that it would permit questions as to whether the witness' power of perception or power of narration were affected by the use of the narcotic." *(People* v. *Bell, supra,* at p. 10.) A medical expert was called as a witness by the defense. "He was prevented from testifying as to the effect of heroin on addicts as to loss of efficiency, ambition, and energy, and the tendency of addicts generally to become increasingly untrustworthy and untruthful, and their tendency to lose their judgment and ability to adjust to social situations. The court, time and time again, told defense counsel that it would permit questions asking what effect heroin used in quantities testified to . . . had upon perception, memory and mental confusion of the user. . . . The court consistently refused to permit the witness to answer the question as to whether this addiction would have any effect on the witness' ability to tell the truth." *(Bell,* at p. 10.) The appellate court held that a witness may be impeached on cross-examination in addition to the methods enumerated by the then controlling section 2051 of the Code of Civil Procedure, "by evidence that he is affected by mental disease or mental derangement that affects his powers of perception, memory or narration. [Citations.]" *(Bell,* at p. 12.) The restrictions placed upon the examination of the medical expert were held to be proper.

In *People* v. *Buono,* 191 Cal.App.2d 203 [12 Cal.Rptr. 604], the trial court excluded evidence concerning the use of narcotics by an accomplice where no expert testimony was offered in connection therewith. As the court stated at page 232, "Its [addiction] effect upon capacity or disposition to tell the truth may become material, but appellants at bar made no effort to support a conclusion that there was such addiction as would affect the credibility of the witness, a subject upon which the experts are not agreed, one upon which a jury is not entitled to speculate." The appellate court concluded that there was no error in the trial court's exclusion of the evidence.

 We consider now the questions propounded to Aiken by the deputy district attorney. We need only cite a few of the numerous examples to indicate that the prosecution was not conforming to principles enunciated in *Bell* and *Buono.*

---

of the witness. [Citation.] It has even been said that proof of addiction alone, without further proof on how addiction affects credibility, is permissible impeachment within the discretion of the trial court. [Citations.] Being effectively blocked along this line of inquiry by Gutierrez's denial he then turned to the matter of his being under the influence of drugs while testifying. . . ."

"Q. Mr. Aiken, on June the 7th, 1968, were you a narcotic addict?

Q. Were you in a physical condition such that you had some physical craving for narcotics back on that date?

Q. Were you taking hard narcotics, heroin, morphine and the morphine derivatives in June of 1968?

Q. By 'some drugs,' you mean heroin?

Q. Were you shooting them with a needle into your body?

Q. Isn't it true that you were attempting to get a fix of heroin on the 8th of June, 1968?

Q. Shortly before you were arrested on the 8th of June, 1968, weren't you making an attempt to obtain some heroin?

Q. Did you talk to them [narcotic officers] about your addiction to the use of hard narcotics at all between June the 8th, 1968, and June the 10th, 1968?

Q. Do you have scars on your arms that have resulted from your having injected narcotics over a period of time?

Q. Have you mainlined in the past?

Q. What does 'mainline' mean?

Q. Does the word 'quarter' have any significance to you so far as narcotics are concerned, the word 'quarter'?"

Throughout the entire examination Aiken denied that he was a narcotic addict, that he had ever used "hard" narcotics or that he was attempting to purchase narcotics on the night of the arrest.

On rebuttal the prosecution called as a witness, E. Adrian LaGrave, a deputy sheriff assigned to the narcotics bureau. He was permitted, over objection, to testify that he had talked to and examined Aiken on the night of Monday, June 10th, 1968. The officer was permitted to express his opinion that Aiken was a narcotic addict, to describe the number of puncture wounds on Aiken's inner arm and the location of several old tracks of scar tissue and to illustrate to the jury by use of a chart prepared by the witness the various scars, old and new, created by puncture wounds. The officer, over objection, was permitted to relate at considerable length, the details of his conversation with Aiken with respect to usage of narcotics and the contents of the telephone call Aiken was making at the time of arrest. On cross-examination the officer did testify that the addict is sometimes the last one to "feel that he is" addicted.

It would only unnecessarily prolong this opinion to set forth further details of the testimony elicited by the prosecution, over repeated objections, in an effort to impeach Aiken's credibility on the *sole* ground that he was addicted to the use of narcotics. A reading of the reporter's transcript would lead one to believe that Aiken was on trial for narcotic addiction. As correctly stated by counsel for Ortega, ". . . I think it is a collateral issue. Secondly, I think the prosecution is attempting to try Mr. Aiken in the situation where it really isn't relevant to the question of this trial, and that is the question of a robbery."

As stated in 52 A.L.R.2d at pages 848-849: "The view adhered to by what may be called the weight of authority is that testimony as to narcotic addiction, or expert testimony as to the effects of the use of such drugs, is not considered admissible to impeach the credibility of a witness unless followed by testimony tending to show that he was under the influence while testifying, or when the events to which he testified occurred, or that his mental faculties were actually impaired by the habit. A minority of the decisions take the broad view that evidence of the use of narcotics is generally admissible for impeachment purposes notwithstanding the absence of the qualifying factors mentioned above." (See said A.L.R. reference for a summary of cases supporting majority and minority views; see also 16 So.Cal.L.Rev., page 333 et seq. for a discussion of this issue with appropriate citations of cases.) Reason and California case law compels the adoption of the majority view. The prosecution produced no witnesses nor made any offer of proof to indicate that Aiken was under the influence at any critical time or that his mental faculties were actually impaired by reason of addiction. The whole line of questioning on this subject was not only improper but highly prejudicial to appellant Ortega and could only have the effect of degrading the witness Aiken.

The People's evidence against Ortega at best was not compelling. The victim originally only "tentatively" identified the appellant. When arrested Ortega did not have possession of any of the fruits of the crime. He produced three witnesses to support his defense of alibi. Most important of these witnesses was Aiken whose credibility was completely destroyed by improper and highly prejudicial cross-examination and other testimony and evidence. (See *People* v. *Vanderburg,* 184 Cal.App.2d 33 [7 Cal.Rptr. 287].) We cannot say that a different verdict as to Ortega might not have resulted had the challenged evidence been excluded. The judgment must be reversed as to Ortega.

The judgment of conviction of appellant Rodriguez is modified to provide that at the time of the commission of the offense, sections 3024 and 12022 of the Penal Code were inapplicable but appellant was armed within the

meaning of section 1203 and the weapon is specified as a gun. In all other respects the judgment of conviction as to Rodriguez is affirmed.

The judgment is reversed as to appellant Ortega.

Roth, P. J., and Fleming, J., concurred.