[Crim. No. 16856. Second Dist., Div. Two. Feb. 16, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST SMITH, Defendant and Appellant.

## Counsel

Charles Hollopeter, under appointment by the Court of Appeal, and Harry A. Schneider for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**WRIGHT, J.**—By information defendant Ernest Smith was charged with the murder of Louis Michael Turpin, a violation of Penal Code section 187. On November 14, 1968, after arraignment and entry by defendant of a plea of "not guilty," on motion of defendant the cause was set for trial for January 6, 1969. On that date at the request of the People the trial date was continued to January 13, 1969. A further continuance to February 3, 1969 was granted at the request of defendant and on that date a motion was made by the People to amend the information by adding the phrase "in the second degree" after the word "murder." After the motion was granted defendant personally and all counsel waived trial by jury. The defendant was found guilty as charged. Motion for new trial and application for probation were denied and defendant was sentenced to the state prison for the term prescribed by law. The appeal is from the judgment and sentence.

### I The Confrontation Issue

The principal issue raised by the defendant on appeal is that he was denied his constitutional right to be confronted by witnesses against him as guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States. This claim of error is based upon a ruling by the trial court which permitted the testimony given at the preliminary hearing of a key prosecution witness to be read into evidence at the trial. Defendant contends that the People failed to demonstrate a good faith effort to obtain the presence of the witness at the trial. We do not agree.

### 1. *The Testimony of The Missing Witness.*

At the preliminary hearing Janet Earl (Janet) was called as a witness for the People and after refusing to testify on the grounds of possible self-incrimination she was granted immunity pursuant to the provisions of section 1324 of the Penal Code. Thereupon she testified as a witness for the prosecution.

As the content of Janet's testimony generally is not at issue but only the receipt into evidence of the same at the trial of defendant, it is unnecessary to set forth at considerable length the sordid narrative she related to the magistrate. Briefly summarized, Janet (who was a prostitute) testified that she had been furnished by defendant with a key to his apartment and was permitted to use the same for the purpose of engaging in acts of sexual intercourse upon the understanding that she would pay defendant $2 each time she visited his dwelling for the purposes indicated.[1]

Janet testified further that shortly before 10 p.m. on October 3, 1968, while she was a patron in the 145 Club in Pasadena, defendant approached her and advised her that he had a "customer" for her. The "customer" was Louis Michael Turpin (Turpin). Janet and Turpin were driven by defendant in his car to the latter's apartment and after payment by Turpin to Janet in the sum of $20, the pair engaged in an act of sexual intercourse. Afterwards Janet and Turpin left the apartment and as they were walking through an alley to the rear of the building defendant approached them and struck Turpin over the head with some unidentified object. A struggle ensued and after the defendant made repeated stabbing motions, Janet observed considerable bleeding from Turpin's chest area. Eventually Turpin ceased struggling and defendant then placed Turpin's body in a trash can located in the rear of the apartment building. Defendant then drove Janet to her home.

## 2. *Applicable Law*

We first examine the applicable law on this issue. The Sixth Amendment of the Constitution of the United States provides in part that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ." In *Pointer* v. *Texas,* 380 U.S. 400 at p. 403 [13 L.Ed.2d 923 at p. 926, 855 S.Ct. 1065], the Supreme Court of the United States held ". . . that the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment."

In *Pointer,* the defendant was arrested on a robbery charge and at the preliminary hearing the complaining witness testified against him. The defendant, who was not represented by counsel, did not cross-examine. At trial the transcript of the preliminary was read as the witness, having moved to another state, was not available. The Supreme Court in reversing the state conviction held that the transcript of the witness' statement had not been taken at a time and under circumstances which afforded the defendant

---

[1]Defendant on direct examination confirmed the arrangement for the use of his quarters but denied he had given Janet a key to his apartment.

through counsel an opportunity to cross-examine and such amounted to a denial of the privilege of confrontation guaranteed by the Sixth Amendment. In *Douglas* v. *Alabama,* 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074], decided during the same term (October 1964) as *Pointer,* the court stated "Our cases construing the clause [confrontation clause] hold that a primary interest secured by it is the right of cross-examination; an adequate opportunity for cross-examination may satisfy the clause *even in the absence of physical confrontation."* (*Douglas* v. *Alabama,* at p. 418 [13 L.Ed.2d at p. 937]; italics added.) The court then quoted from its earlier decision in *Mattox* v. *United States* as follows: " 'The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness . . .' " (*Douglas* v. *Alabama,* at pp. 418-419 [13 L.Ed.2d at p. 937].)

The landmark opinion of *Barber* v. *Page,* 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318], followed in 1968. Without reciting in detail the facts of that case, it is sufficient to indicate that at trial the state made no effort to secure the presence of a witness who had testified at the preliminary hearing and the court permitted at the trial the introduction into evidence of the transcript of the earlier proceeding. The reason for the failure to compel the appearance of the witness was that he was incarcerated in a federal prison outside the state wherein the trial took place. The court at pages 724-725 [20 L.Ed.2d at p. 260] noted that ". . . a witness is not 'unavailable' for the purposes of the foregoing exception to the confrontation requirement *unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."* (Italics added.) The court in reversing concluded that: "While there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case." (*Barber,* at pp. 725-726 [20 L.Ed.2d at p. 260].)[2] In short, the issue in the cause before this court is whether the witness Janet was in fact unavailable and whether the People made a good faith effort (due diligence) to secure her presence at trial.

### 3. *The Good Faith Effort.*

At the outset it should be mentioned that section 1291[3] of the Evidence

---

[2]In *Berger* v. *California,* 393 U.S. 314 [21 L.Ed.2d 508, 89 S.Ct. 540], decided on January 13, 1969, the Supreme Court of the United States held that the holding of *Barber* v. *Page, supra,* should be given retroactive application.

[3]Evidence Code section 1291 provides in part that "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:

Code specifically permits the introduction of the former testimony of a witness under circumstances similar to those presented in the cause before us. We, however, are concerned primarily with the constitutional aspect of the right of confrontation and not with problems of statutory interpretation.

Prior to the beginning of the trial the People called a number of witnesses for the purpose of proving not only that Janet was unavailable but that considerable time and effort had been expended by the prosecution in an unsuccessful attempt to locate her and compel her attendance in court. The hearing on this limited issue consumed the goodly portion of two trial days, February 3d and 4th, and at the request of the defendant the trial judge adjourned proceedings until March 24th to afford the defendant an opportunity to petition the Court of Appeal for a writ of prohibition. The application for the writ was denied without opinion and on the date to which the trial had been continued the People produced additional evidence showing what efforts had been made during the intervening seven-week period. At the conclusion of the hearing the trial judge ruled that Janet was not available and that the prosecution had demonstrated a good faith effort in their attempts to locate her. The transcript of her testimony given at the preliminary hearing was then read into evidence.

■ Realizing that even a limited recital of the evidence produced at the pretrial hearing would unduly lengthen this opinion, we have set forth in an appendix,[4] which by this reference is made a part of this opinion, a brief summary of the testimony adduced at that proceeding. A review of the entire record on appeal convinces us that the prosecution made an overwhelming showing of a good faith effort prior to the February 3d trial date as well as prior to the continued date of March 24th. Under the circumstances there was no abuse of discretion on the part of the trial judge in permitting the testimony of Janet given at the preliminary hearing to be read into evidence at the trial.

We are not persuaded by defendant's argument that the showing of a good faith effort is determined as of the time the cause was set for trial originally, to wit, January 6th, and not as of the actual date when proceedings began. As previously indicated a continuance of one week was granted at the request of the People followed by a continuance of three weeks at the request of the defendant. The critical date was thus, February 3d, the date the cause was called for trial and the relevant evidence on the good faith

"(1) . . .

"(2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

[4]See appendix at conclusion of opinion.

issue relates to efforts made at a time reasonably prior thereto. The record discloses that almost continuous efforts were made by the prosecution from late December of 1968 up to the date of trial and then up to the continued trial date to locate the missing witness. The record further discloses that each lead was followed by the investigators even though the same resulted in failure.

We find no merit in defendant's contention that there was an absence of a good faith showing by reason of the fact that Officer Kastner made no objection to the California Youth Authority at the time that that agency gave permission for Janet to leave the state. We consider the issue moot as there was no evidence that Janet at any time left California. The evidence is all to the contrary.

Mention should be made of several cases cited by defendant in support of his position. Each presents a substantially different factual situation from that in the cause before this court. In *People* v. *Casarez,* 263 Cal.App.2d 130 [69 Cal.Rptr. 187], the only evidence introduced in support of the good faith showing was the testimony of a narcotics agent to the effect that the missing witness had departed for Chicago; that a telephone call had been made to a Chicago number; and that the individual who answered the call informed the agent that the absent witness was "downtown."

In *People* v. *Harris,* 266 Cal.App.2d 426 [72 Cal.Rptr. 423], no evidence was produced in support of the claim of due diligence. The entire good faith showing consisted of statements of counsel detailing the number of times the process servers had visited the home of the missing witness who, according to the prosecution, was somewhere in Canada.

In *People* v. *Berger,* 272 Cal.App.2d 584 [77 Cal.Rptr. 617], the state authorities learned that the missing witness was in Colorado. The investgator did nothing more than ask the grandmother of the witness to send a collect telegram verifying that fact. No effort was made to secure the presence of the witness in court.

In *People* v. *Bailey,* 273 Cal.App.2d 99 [78 Cal.Rptr. 107], the record did not show that the prosecutorial authorities made any effort to persuade one missing witness to return to California from Texas or sought her attendance under the Uniform Act, or in fact made any effort to obtain her presence. With respect to a second missing witness the authorities sent two telegrams inquiring about his plans to return to California and in response received answers stating that he did not intend to return to this state. The

record did not show that any additional efforts had been made to secure the presence of the witness at trial.

### 4. *Additional Factors.*

As Janet was the only eyewitness to the murder, the importance of her testimony was apparent as was the desirability of her presence at trial. However, it must be mentioned that defendant was represented at the preliminary hearing by the same highly skilled attorneys who represented him at trial. The examination and cross-examination of Janet at the preliminary hearing was painstakingly thorough and constitutes some 102 pages of the reporter's transcript on appeal, of which 57 pages represent cross-examination of the witness. Except for the limitation on the attack upon Janet's credibility by reason of her purported narcotic addiction,[5] the magistrate permitted exhaustive cross-examination of every facet of her direct testimony as well as inquiry into any matter which might have a bearing upon the case.

We are well aware that a preliminary hearing cannot generally be equated with a trial; that the former is designed as "an efficient and speedy means of determining the narrow question of probable cause" (*People* v. *Green,* 70 Cal.2d 654, 665 [75 Cal.Rptr. 782, 451 P.2d 422]); that the latter is designed as a forum to determine the guilt or innocence of a defendant. However, in the case at bench thorough and lengthy cross-examination was permitted at the preliminary hearing.

A second factor also must be considered. The trial of the cause took place before a judge and not before a jury. The trial judge was one of the most experienced members of the superior court, having been a member of the same for more than 20 years and having presided over a myriad of criminal cases. We do not contend that the cold reading of the preliminary transcript is as effective as contemporaneous cross-examination but under the circumstances demonstrated here the difference was reduced to a minimum.

We are aware that earlier opinions of the United States Supreme Court in discussing the right of confrontation mentioned the importance of the *jury* observing the witness for the purpose of determining his credibility. We are also aware that in the most recent pronouncement on this issue that court stated: "As we pointed out in *Barber* v. *Page,* one of the important objects of the right of confrontation was to guarantee that the *fact finder* had an adequate opportunity to assess the credibility of witnesses. [Citation.]" (*Berger* v. *California,* 393 U.S. 314, 316 [21 L.Ed.2d 508, 510, 89

---

[5]The credibility issue will be considered separately in this opinion. See *post.*

S.Ct. 540].) (Italics added.) We do not, however. interpret the change in the language to indicate an expression of the court that under no circumstances could the testimony of a witness given at an earlier proceeding be received at a later trial when that witness was unavailable and a good faith showing had been demonstrated.

## II THE IMPEACHMENT ISSUE

Defendant contends that at the preliminary hearing the magistrate committed reversible error by restricting inquiry as to whether the key prosecution witness, Janet, was a narcotic addict. We do not agree.

At the very outset of his cross-examination, counsel for defendant, after looking at the inner portion of the elbow of the witness, commented in open court: "There appears to be about a three-quarter inch scar or track of scars on there." When objection was sustained to a question as to the cause of the scars, counsel for defendant stated to the court that the purpose of the inquiry was to determine credibility; "that a person who uses heroin is not prone to be a truthful, honest person."

The court correctly stated the law as follows: "If what you are alluding to . . . is whether or not on this occasion she might have been under the influence of some narcotic drug, going to the question of her ability to perceive, I have no quarrel with letting you go into that. But I do not feel that there is either case law or anything that would justify this Court into taking the view that anyone who uses heroin is ipso facto a person who is prone to tell lies." The court properly indicated to counsel that it would not permit further inquiry about narcotic addiction directed to the character of the witness but would permit inquiry directed to the "ability" of the witness to "perceive" by reason of narcotic addiction. Following such rulings the court allowed numerous questions to be addressed to the witness about her use of narcotics. A review of the record clearly demonstrates that counsel for defendant elicited sufficient information that could have led only to the inescapable conclusion that the witness was involved in the use of hard narcotics.

Defendant cites *People* v. *Bell,* 138 Cal.App.2d 7 [291 P.2d 150], to support his position on this issue. Such reliance is misplaced. *Bell* involved a charge of pandering and the prosecutrix was asked on cross-examination about her use of heroin. "During this cross-examination, the trial court consistently ruled that it would permit questions relevant as to whether the witness' power of perception or power of narration were affected by the use of the narcotic." (*People* v. *Bell,* at p. 10). A medical expert was called as a witness by the defense. "He was prevented from testifying as to the effect of heroin on addicts as to loss of efficiency, ambition, and

energy, and the tendency of addicts generally to become increasingly un-trustworthy and untruthful, and their tendency to lose their judgment and ability to adjust to social situations. The court, time and time again, told defense counsel that it would permit questions asking what effect heroin used in quantities testified to . . . had on the perception, memory and mental confusion of the user. . . . The court consistently refused to permit the witness to answer the question as to whether this addiction would have any effect on the witness' ability to tell the truth." (*People* v. *Bell,* at p. 10.) The appellate court held that the restrictions placed upon the cross-examination of the prosecutrix and of the medical expert were proper. (See also *People* v. *Buono,* 191 Cal.App.2d 203 [12 Cal.Rptr. 604]; *People* v. *Ortega,* 2 Cal.App.3d 884 [83 Cal.Rptr. 260]; *People* v. *Perez,* 239 Cal. App.2d 1 [48 Cal.Rptr. 596], containing dicta contra.)

██ "The view adhered to by what may be called the weight of authority is that testimony as to narcotic addiction, or expert testimony as to the effects of the use of such drugs, is not considered admissible to impeach the credibility of a witness unless followed by testimony tending to show that he was under the influence while testifying, or when the events to which he testified occurred, or that his mental faculties were actually impaired by the habit. A minority of the decisions take the broad view that evidence of the use of narcotics is generally admissible for impeachment purposes notwith-standing the absence of the qualifying factors mentioned above." (52 A.L.R.2d at pp. 848-849.) (See 16 So.Cal.L.Rev., p. 333 et seq., for dis-cussion of this issue with appropriate citations of cases.)

As we said in *People* v. *Ortega, supra,* at page 902, "Reason and Cali-fornia case law compels the adoption of the majority view." ██ No offer of proof was made nor were any witnesses produced to indicate that Janet was under the influence at any critical time or that her mental faculties were actually impaired by reason of narcotic usage. The rulings of the mag-istrate were proper.

The judgment and sentence are affirmed.

Herndon, Acting P. J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 15, 1970. Peters, J., was of the opinion that the petition should be granted.

### APPENDIX

Evidence adduced at the two hearings are separately set forth.

(a) *The February 3d and 4th Hearing.*

A summary of the testimony of Robert Seiler, an investigator with the office of the district attorney follows: On January 7, 1969, armed with a subpoena directed to Janet Earl, he consulted with Officers Joseph Kastner and Benjamin C. Hetherington of the Pasadena Police Department to secure assistance in locating Janet. Having

been advised that Janet's sister was incarcerated at Sybil Brand Institute, Seiler talked with a sergeant at that institution and learned that the sister had been released and her whereabouts was unknown. Seiler then talked with Mrs. Linda Warren, Janet's parole officer, who stated that Janet had been granted permission to go to Texas. However, the parole officer had discovered after talking with the mother of Janet, that her daughter had not gone to Texas and had been in Pasadena at Christmas time and had then left for the San Mateo area.

Seiler telephoned the chief of the bureau of investigation of the district attorney's office in San Mateo County and sought his assistance. The records of the sheriff's office in Los Angeles and of the Los Angeles Police Department were checked for warrants and wants. The CII record in Sacramento was also checked. As Janet was receiving aid from the bureau of public assistance, that office was contacted and Janet's case worker advised Seiler that Janet was somewhere in the San Mateo area.

On January 10, Seiler flew to the San Francisco Bay area and continued his investigation. He consulted with police departments of the Cities of San Mateo, Burlingame, San Francisco, Berkeley, Redwood City, Palo Alto and Atherton. The sheriff's office of San Mateo County and the coroner's office, the health and welfare department and the health department of that county were also consulted as were the records of the telephone company and the department of vital statistics.

As Janet, several years previously, had lived in the Haight-Ashbury District in San Francisco, Seiler checked the apartments where she had at one time resided. Carrying a photograph of Janet, Seiler visited drug stores and liquor stores and showed the picture not only to sales personnel but to many others in that area. No one recognized the subject. Narcotics and special services detail at the San Francisco Hall of Justice were checked as were all hospitals in the bay area. Seiler visited the East Palo Alto area and in company with a local deputy visited and inspected the large housing complex where most transients resided. Having been unsuccessful in his search in northern California, Seiler returned to the Pasadena area. There he discovered that a warrant for Janet's arrest had been issued as a parole violator. All local hospitals were checked as was the local coroner's office. Word was left at various agencies in both the bay area and locally to advise Inspector Seiler if Janet's whereabouts became known.

A summary of the testimony of Joseph C. Kastner of the Pasadena Police Department follows: He attempted to serve a subpoena on Janet Earl and learned that after the preliminary hearing she had been granted permission by the California Youth Authority to go to Texas. Two addresses of relatives in that state were checked and it was learned that Janet never arrived at either of the locations. The reason that permission to leave the state had been given was that Janet was in fear for her life as the defendant's brother had come to her residence and told her to leave town if she had any knowledge of the killing.

Kastner listened on the telephone when Officer Hetherington talked with Janet's mother. The latter stated that Janet had been home for the holidays and then had departed for the San Mateo area. Her present whereabouts was unknown.

Officers of the Pasadena Police Department were informed to keep a look out for Janet. Their reports were all to the effect that she had not been seen in the Pasadena area since the preliminary hearing was concluded.

A summary of the testimony of Benjamin C. Hetherington of the Pasadena Police Department follows: Sometime before Christmas of 1968, armed with a subpoena, he attempted to serve the same on Janet but was unsuccessful. He had talked with his fellow officers assigned to the vice-narcotic detail and had asked them to be on the look out for Janet and to check the area of the 145 Club, a location where Janet was known to frequent. He had himself been in and around the area of the 145 Club more than 30 times during the previous month and had not seen the missing witness.

A summary of the testimony of Gladys Earl, mother of Janet, follows. Her

daughter Janet had visited her on Christmas day in 1968 and had left the following day stating that she was going to the San Mateo area. The welfare check for the month of December had been endorsed by Janet and cashed but the January check was still in the possession of the mother. No information had been received as to Janet's whereabouts even though the latter had left her child in Pasadena. Both Officers Kastner and Hetherington had talked with her on at least two occasions making inquiries concerning Janet.

(b) *The March 24th Hearing.*

A summary of the testimony of Gladys Earl, mother of Janet, given at the second hearing follows: She had received a telephone call from Janet during the interval from the previous hearing. Her daughter had said she was living in San Francisco but she did not furnish the mother with an address in that city or a telephone number. No other communication had been received from Janet.

A summary of the testimony of Officer Hetherington given at the second hearing follows: He had furnished other officers of the Pasadena Police Department with a description and photographs of Janet and had asked them to check in particular her mother's residence and the Fair Oaks and Claremont and the Orange Grove and Summit areas which Janet frequented. The officer personally checked the locations and also talked with Janet's mother. No trace of Janet was found.

He also talked with Linda Warren, Janet's parole officer, and was informed that Janet was living at 860 Eddy Street, Apartment 15, in San Francisco. He was also told that Janet had been instructed to get in touch with the parole office in Oakland and that she had been told to report there on February 5th.

On February 10th, Investigator Seiler was furnished with three additional photographs of Janet and Seiler left that day for San Francisco. Later Hetherington was informed that Janet was not at the Eddy Street address, having moved a week earlier. This information was relayed to Janet's parole officer who telephoned the Youth Authority administration in Oakland and discovered that although Janet had appeared at their office on February 5th she had left when she was told that the individual to whom she was to report was attending a meeting.

Hetherington was informed that Judith Hathcock, Janet's sister, was in custody and on February 17th, he interviewed her and was told that Janet had left San Francisco four days previously and that she intended to go to either Texas or North Carolina.

On February 18th, Officer Kastner informed Hetherington that Gladys Earl had telephoned and reported that on February 13th she had received a call from Janet asking for money and stating that she was thinking of turning herself in. Janet did not tell her mother where she was calling from nor did she give any information as to where she could be reached.

On March 6th, Hetherington again talked with the parole officer and learned that Janet had not reported back to the Oakland office and that the Youth Authority had an outstanding warrant for Janet's arrest. He was told that if Janet was apprehended the Pasadena Police Department would be notified at once.

A summary of the testimony of Investigator Seiler given at the second hearing follows: On February 10th he left for San Francisco, armed with a subpoena, and proceeded to the San Francisco Hall of Justice. Together with a local narcotics officer they went to the Safari Motel located at 860 Eddy Street. There the night manager was interviewed and shown a photograph of Janet. He identified her as a prior tenant known to him as "April," who had shared a room with two other girls. All three of the girls were engaged in prostitution and had worked for a well known procurer in the Tenderloin District.

Seiler visited the vice division of the San Francisco Police Department, showed photographs of Janet to the personnel there as well as to the personnel of the narcotics detail. No one recognized Janet.

Seiler interviewed the day manager of the Safari Motel and was told that Janet had

been a resident of the motel from November 13, 1968 to February 5, 1969 and that she was engaged in prostitution during that period. The manager expressed the opinion that Janet might be working out of a motel named The Executive. Seiler visited that motel but the manager there did not recognize the photograph of Janet.

Seiler wrote to the sheriff of the Texas town where Janet's uncle resided and on March 18th was informed that the family there was expecting Janet and if she did arrive the California authorities would be so advised at once. No further communication was received from Texas as of the date of the continued hearing.